

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-1996

# In Re: RML Inc

Precedential or Non-Precedential:

Docket 95-7580

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"In Re: RML Inc" (1996). *1996 Decisions.* Paper 83.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/83

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-7580

_____

IN RE R.M.L., INC., previously
known as INTERSHOE, INC.    Debtor

MELLON BANK, N.A.,        Appellant

v.

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF R.M.L., INC., previously
known as INTERSHOE, INC.

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 95-cv-01200)

_____

Argued June 5, 1996

Before:  COWEN, NYGAARD and LEWIS, Circuit Judges

(Filed August 1, 1996)

_____

Edward I. Swichar (ARGUED)
Earl M. Forte, III
Blank, Rome, Comisky & McCauley
1200 Four Penn Center Plaza
Philadelphia, PA 19103

        COUNSEL FOR APPELLANT


Mary F. Walrath (ARGUED)
Pauline K. Morgan, Esq.
Clark, Ladner, Fortenbaugh & Young
One Commerce Square
2005 Market Street
Philadelphia, PA  19103

        COUNSEL FOR APPELLEE

—————————————

OPINION OF THE COURT
—————————————

COWEN, Circuit Judge.

         We confront in this case a difficult issue arising under 11 U.S.C. § 548(a)(2), the provision of the Bankruptcy Code (the "Code") allowing for avoidance of constructively fraudulent transfers.  The principal question we must decide is whether a commitment letter Mellon Bank issued in connection with a contemplated $53-million loan conferred "reasonably equivalent value" on Intershoe (the debtor) in exchange for $515,000 in commitment fees that Intershoe paid to Mellon Bank.  This question is complicated by the fact that the loan, which could possibly have saved Intershoe from bankruptcy, ultimately failed to close.  We also must decide whether Intershoe was insolvent when it transferred the commitment fees to Mellon Bank.

         After finding that Intershoe was insolvent during the relevant period, the bankruptcy court, relying on a "totality of the circumstances" test, concluded that Intershoe had not received "reasonably equivalent value" in exchange for the $515,000 in fees it had paid to Mellon.  The court found that the loan commitment was so conditional when issued that it conferred virtually no indirect economic benefit on Intershoe.  It therefore ordered Mellon Bank to remit to the bankrupt estate all but $127,538.04 of the commitment fees, an amount representing Mellon Bank's out-of-pocket expenses.  The district court summarily affirmed.  Because the commitment letter was so conditional that the chances of the loan closing were minimal, we agree that Intershoe did not receive value that was reasonably equivalent to the fees it paid Mellon Bank.  Accordingly, we, too, will affirm.

I.

A.

         At all times relevant to this dispute, Intershoe was a large-scale wholesale distributor of women's shoes.  Through 1991, its primary secured lender was Signet Bank.  In the spring of 1991, Intershoe was aware that its financing arrangement with Signet would terminate that fall.  It therefore sought to recapitalize and refinance its operations.  Intershoe wanted to attract a $15 million equity investment; it also wanted to replace Signet as its lender with a bank group that would extend a $53 million loan facility.

         In March of 1991, Three Cities Research ("TCR") made an initial, nonbinding proposal to make a $15 million investment in Intershoe and began to conduct due diligence and negotiations toward that end.  Hoping that the prospect of an equity infusion would entice potential lenders, Intershoe approached Mellon Bank, Bank of New York ("BNY") and Citicorp to discuss potential refinancing. Each bank made clear that an equity infusion would be a prerequisite to any refinancing.  Representatives of Mellon and Intershoe first met in either February or March of 1991.

On June 13, 1991, Mellon issued a proposal letter documenting its interest in extending a $53 million revolving line of credit and a $100 million foreign exchange line of credit. The proposal was contingent upon TCR's injection of $15 million in cash. At first, Intershoe did not accept Mellon's offer. Instead, it explored the possibility of obtaining financing from BNY and Citicorp. After completing its due diligence, however, Citicorp declined to extend credit to Intershoe. Although BNY had made a proposal, it subsequently revised the proposal to require a large equity infusion. Intershoe therefore declined to endorse BNY's proposal and, instead, turned its attention back to Mellon Bank.

On August 9, 1991, Mellon Bank issued a second proposal letter that was similar to the first in that it was conditioned upon the injection of new capital funds of at least $15 million. The letter also stated that Intershoe would be required to pay: (1) a facility fee equivalent to 3/4 of one percent (.0075) of the committed facility (half upon issuance of the commitment letter, half at closing); (2) a collateral management fee of $10,000; (3) all of Mellon's out-of-pocket expenses, regardless of whether the financing occurred; and (4) a "good faith deposit" of $125,000 to be remitted with written approval of the proposal letter. A fifth provision in the letter was that Mellon would be permitted to spread $28 of the $53 million loan among a group of banks. The loan contemplated by Mellon was known as a highly leveraged transaction ("HLT"), an asset-based loan bearing greater risk than an ordinary loan that requires extraordinary due diligence and monitoring of the borrower's accounts receivable, inventory and business plan.

On August 12, 1991, Intershoe remitted to Mellon the $125,000 "good faith deposit" in accordance with the proposal letter. Because it had reached its borrowing limit with the Signet Group, Intershoe could not borrow additional sums. Between August and October of 1991, Intershoe failed to pay the majority of invoices from its suppliers. While accounts payable increased by $10 million, its debt to the Signet Group decreased by the same amount; Intershoe was using what funds it had to pay down its debt. As a result, the Signet group agreed to extend its loan facility from September 30 to November 29, 1991, which permitted Intershoe to continue its business operations.

In early October of 1991, Mellon Bank requested an additional good faith deposit from Intershoe of $125,000, although there was nothing to document this request. On October 8 or 9, 1991, Intershoe remitted the additional $125,000 to Mellon Bank by wire transfer. On October 31, 1991, Westinghouse, to whom Intershoe had subordinated indebtedness, agreed to restructure Intershoe's indebtedness in order to accommodate the proposed recapitalization.

On November 7, 1991, Mellon issued a formal commitment letter (the "Letter") with terms that tracked the August 9 proposal letter. The Letter referred to the $250,000 in good faith deposits that Mellon had previously received and indicated that the entire amount would be retained even if the loan did not close. These deposits would cover Mellon's expense, time and effort in attempting to consummate the financing. The Letter also required

the remittance of an additional $265,000, half of which represented a nonrefundable "facility fee" for Mellon's commitment, with the other half representing a nonrefundable agent's fee for Mellon's syndication of the loan. The Letter also contained several conditions: (1) Intershoe had to produce a draft audited financial statement indicating that it had a net worth of at least $6.5 million; (2) Intershoe was required to repay or retire Westinghouse's debt and stock warrants and retain Westinghouse as a creditor for subordinated debt of at least $5 million; (3) $28 million of the loan commitment had to be participated out to a group of banks; and (4) Intershoe would be required to pay a separate collateral monitoring fee relating to administering the loan after closing. By its terms, the commitment was set to expire on November 29, 1991, the same day that Signet's loan facility was due to expire.

On November 7, 1991, Intershoe accepted Mellon's commitment and remitted the $260,000 fee as contemplated by the Letter. That day Mellon began a "takedown examination" to update Intershoe's financial information through the closing date. Eight days later Mellon received a draft financial statement confirming that Intershoe possessed a positive net worth of $6.5 million dollars. Mellon then scheduled a meeting for November 20, 1991, with Intershoe, the loan participants, TCR (the equity investor) and Peat Marwick to discuss further the financial statements.

On November 17, 1991, however, TCR advised Intershoe that it had decided not to make the $15 million equity investment and confirmed its withdrawal from the proposed refinancing. Intershoe informed Mellon of this development the next day, and the entire deal collapsed. Intershoe's trade creditors continued to extend credit even after the collapse of the Mellon financing.

On November 15, 1991, Peat Marwick issued to Intershoe an audited financial statement for the fiscal year ending August 31, 1991. This statement indicated that as of August 31, Intershoe's liabilities exceeded its assets by four million dollars. In accordance with Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Accounting Standards ("GAAS"), the financial statement took into account events subsequent to the end of the fiscal year (e.g., the collapse of the Mellon financing) as evidence of Intershoe's financial condition. Several questionable items on Intershoe's balance sheet were corrected or adjusted, resulting in an even lower net worth. The financial statement also indicated that Intershoe would have difficulty continuing as a going concern. On December 11, 1991, Intershoe agreed to accept Peat Marwick's suggested changes to its financial statements. Intershoe's financial condition continued to decline, reaching a point where its liabilities exceeded assets by $14 million. Intershoe sought protection under Chapter Eleven of the Code on February 18, 1992.

B.

On May 18, 1993, the Committee filed an adversary proceeding against Mellon Bank seeking to recover, as constructively fraudulent transfers, the three payments that Intershoe had made to Mellon in connection with the financing commitment, which totaled $515,000. Under section 548(a)(2) of the

Code, the Committee bore the burden of establishing that: (1) the debtor had an interest in the property; (2) the transfer of the interest occurred within one year of the petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor received "less than a reasonably equivalent value in exchange for such transfer."  BFP v. Resolution Trust Corp., 511 U.S. 531, ___, 114 S. Ct. 1757, 1760 (1994) (quoting 11 U.S.C. § 548(a)(2)(A)).  The first two elements were not disputed.

1.

On the issue of insolvency, which is defined in § 101(32)(A) of the Code as a financial condition where an entity's debts exceed its property (at fair valuation), the bankruptcy court focused upon August 31, 1991, the end of Intershoe's fiscal year. It concluded that the Committee had established through the testimony of four certified public accountants, who relied upon Intershoe's audited (and adjusted) financials, that Intershoe was insolvent as of that date.

Mellon attempted to argue that it was the write-offs that rendered Intershoe insolvent, and that the write-offs were caused by the collapse of the Mellon Bank-Intershoe deal.  The bankruptcy court disagreed:

> Although events which drastically and unexpectedly change a company's actual financial condition (such as a fire or other disaster) would not be the type of subsequent event that should evidence a company's prior financial condition, I agreed with the testimony of the Committee's experts that the failure of the proposed Mellon/Intershoe transaction is exactly the type of event that should be viewed as evidence of the company's prior financial condition.
>
> By all accounts, Intershoe's financial survival was contingent upon the Mellon refinancing and the Mellon refinancing was contingent upon dozens of conditions, the least certain and most important of which was an equity infusion from TCR.  TCR had made no commitment to go through with the investment, and, more importantly, the financial numbers coming out of Intershoe in September, October and November of 1991, showed a deteriorating financial condition that would cause serious concern to a potential equity investor. Although there was testimony that supported Mellon's belief that TCR still was considering the transaction into November, 1991, the evidence was persuasive that TCR's participation was sufficiently uncertain that anticipated consummation of the equity investment and ultimately the Intershoe/Mellon transaction should not be the basis for

upholding book entries that ultimately turned
out to have no basis in reality.

Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Mellon
Bank N.A., No. 1-93-00137A, slip op. at 15-16 (Bankr. M.D. Pa. June
29, 1995).  Based on these audited financials, the bankruptcy court
noted that between August and November of 1991, Intershoe suffered
"numerous materially adverse changes which resulted in $4.1 million
in losses for September and October, 1991."  Id. at 6 (footnote
omitted).  The court also noted that "by the end of October, 1991,
Intershoe's liabilities exceeded its assets by $8,187,903."  Id.n.2.  The
bankruptcy court went on to conclude that, even without
placing exclusive reliance upon the audited financial statements,
subsequent events shed sufficient light on Intershoe's financial
condition as to warrant downward adjustments in various alleged
"credits" and book entries.  Id. at 18.

### 2.

The bankruptcy court next considered whether Intershoe
had received "reasonably equivalent value" for the three separate
remittances of financing fees.  Although the term "reasonably
equivalent value" is not defined in the Code, the court
acknowledged that the debtor need not receive a dollar-for-dollar
equivalent in order to receive reasonably equivalent value.  The
court further acknowledged that the fair value of services rendered
in exchange for fees paid may be difficult to quantify, yet
nonetheless may constitute reasonably equivalent value.  The court
applied a "totality of the circumstances" test, which considered:
(1) the good faith of the transferee (Mellon Bank); (2) the fair
market value compared to the price paid; and (3) whether the
transaction was at arm's length.

### a.

The bankruptcy court's conclusions concerning the August
12, 1991, transfer of $125,000 were somewhat contradictory.  This
transfer was the good-faith deposit required by the August 9, 1991,
proposal letter to cover Mellon's out-of-pocket expenses.  The
court first concluded that the transfer had conferred no value on
Intershoe, observing that the loan had failed to close and that
Intershoe's financial condition had not improved.  See id. at 26
("The Committee's evidence that no benefit was conferred is simple
and accessible yet is quite powerful in its simplicity.").

The bankruptcy court rejected Mellon's contention that
the existence of the proposal letter had indirect benefits, such as
encouraging Signet to extend its financing commitment or causing
trade creditors to extend unsecured credit.  The court observed
that Intershoe's trade suppliers extended credit both before the
financing proposal and after the deal with Mellon had collapsed.
Thus, the prospect of financing from Mellon lacked a causal
relationship with the trade suppliers' extension of credit.  The
court further noted that the existence of Mellon's financing
commitment had little or no effect on Signet's decision to extend
its loan facility.

Notwithstanding these conclusions, the bankruptcy court
determined that Mellon could retain the $125,000 transfer:

Mellon established a valid contractual basis

for retention of the $125,000.00. The August 9, 1991, proposal letter provides for a good faith deposit in that amount and Mellon established to my satisfaction that such agreement was of an ordinary commercial nature and that Mellon actually and reasonably incurred out-of-pocket expenses through the cessation of its takedown examination in excess of the $125,000.00 deposit such as warranted retention of the deposit under the agreement. The contractual nature of this relationship is entitled to some degree of respect in the balancing. Additionally[] . . . the evidence indicated that the parties were at arm's-length at the time the proposal was issued and accepted. Finally, a three month period passed between the transfer of the initial $125,000.00 and the termination of the proposed transaction; there was adequate time for some degree of the types of indirect benefit alleged by Mellon to accrue with respect to this initial transfer.

Id. at 26-27. The court also rejected the Committee's claim that the expenses were inflated and unreasonable.

b.

The October 8, 1991, transfer of $125,000 was described in testimony as an additional good-faith deposit. It was not discussed in the proposal letter, however, and there was no independent documentation of it. The bankruptcy court determined that, if no commitment letter had issued, Intershoe would have been entitled to a refund of this good-faith deposit (as well as the first one). It drew this conclusion from the fact that the proposal letter did not provide for Mellon's retention of the "deposits." Indeed, it was not until the Letter was executed on November 7, 1991, that Intershoe gave up its right to a refund of the $250,000 in good-faith deposits it had paid to Mellon. Because it was on November 7 that the second deposit became "irrevocable" under the terms of the executed commitment letter, the bankruptcy court chose that date--not October 8--as the date of the transfer for "reasonably equivalent value" purposes.

The bankruptcy court concluded that Mellon had conferred no benefit, direct or otherwise, on Intershoe between November 7 and the collapse of the deal after TCR's withdrawal on November 17, 1991. It found, first, that the short-lived commitment conferred little or no value because it was highly conditional; i.e., it was contingent upon a significant equity investment from TCR, which had made no formal commitment to invest in Intershoe. The court observed that Intershoe's deteriorating financial condition would have deterred an equity investor from making such an investment. The court then noted that the commitment letter conferred no indirect value on Intershoe, such as causing trade suppliers or Signet to extend credit.

The bankruptcy court rejected Mellon's claims that it had

conferred value to the extent its officers had expended "man-hours" working on the deal and opportunity costs of forgoing other deals. From the perspective of Intershoe's creditors, it reasoned, Mellon's internal costs were irrelevant if no value had been conferred on the debtor: "what would have been important would have been a firm and less conditional commitment." Id. at 31. The court further concluded, based on trial testimony, that "internal costs are not normally factored into loan transactions exclusive of facility-type fees; therefore there is no commercial basis independent of the November 7th agreement for retention of" the second good-faith deposit. Id.

> Finally, the bankruptcy court pointed out that [b]y November 7th, the arm's-length nature of Intershoe's relationship with Mellon had disintegrated; Intershoe's financial condition had deteriorated and the Mellon loan appeared to be one of few if not the only remaining option Intershoe had to survive as a going concern. Mellon, then, had the opportunity to extract fees not ordinarily warranted on a (sic) arm's length commercial basis.

Id. (footnote omitted). The court observed in a footnote that while it was rejecting the Committee's suggestion that by November 7th Mellon was simply extracting fees for a loan commitment that it knew would never come to fruition, "Mellon had ample reason to believe there was a significant possibility that Intershoe could not meet one or more of the conditions of the commitment letter, including the TCR equity investment." Id. n.17.

With respect to the second "good-faith deposit," the bankruptcy court held that "it is extremely difficult to conclude that Mellon's conditional commitment had a great deal of value. Based upon the totality of the circumstances, the Committee has established that Mellon failed to confer reasonably equivalent value . . . ." Id. at 31-32.

c.

The bankruptcy court then turned to the $265,000 transfer on November 7, 1991, which represented the nonrefundable facility/agent's fee contemplated by the commitment letter. For essentially the same reasons that it found that no value had been conferred in exchange for the October 8 transfer (which in reality also occurred on November 7), the bankruptcy court concluded that Intershoe had not received reasonably equivalent value for the facility fee. Although recognizing that Mellon had put on credible evidence that a $265,000 facility fee was commensurate with fees in the industry for the size of the loan at issue, that did not alter the analysis, the bankruptcy court said. It was unlikely that under ordinary circumstances Intershoe would have handed over large fees where the letter was conditioned upon an equity investment but where there was no firm commitment from the equity investor. Again, the court noted that from the creditors' perspective, Mellon had provided Intershoe with little, if any, value in drafting a highly conditional commitment letter.

3.

On appeal, the District Court for the Middle District of Pennsylvania affirmed, adopting the bankruptcy court's opinion as its own. Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc., No. 1:CV-95-1200 (M.D. Pa. Oct. 13, 1995). This appeal followed.

## II.

The bankruptcy court had jurisdiction over this adversary (core) proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). The district court exercised appellate jurisdiction over Mellon's appeal from the bankruptcy court's final order under 28 U.S.C. § 158(a)(1). We have appellate jurisdiction to review the district court's final order pursuant to 28 U.S.C. §§ 158(d) and 1291.

Whether Intershoe was insolvent or received "less than fair consideration" are mixed questions of law and fact. Moody v. Security Pac. Business Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992). Thus, while the factual findings underlying those determinations are reviewed only for clear error, see, e.g., Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 641-42 (3d Cir. 1991), cert. denied, 503 U.S. 937, 112 S. Ct. 1476 (1992), our review of "the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts" is plenary. Id. at 642 (internal quotation marks omitted) (quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 103 (3d Cir. 1981)).

## III.

As it did in the courts below, Mellon Bank urges reversal on two grounds. First, Mellon Bank asserts that the commitment letter conferred "reasonably equivalent value" on Intershoe, the measure of which is the fair market value of the services it rendered (i.e., the $515,000 in commitment fees Intershoe paid). Second, Mellon Bank claims that based upon Intershoe's own balance sheets at the time of the disputed transfers, Intershoe was not insolvent.

### A.
### Reasonably Equivalent Value

Mellon Bank launches a multi-pronged attack on the bankruptcy court's reasonably equivalent value analysis, assailing the court's use of a totality of the circumstances test. The gravamen of Mellon Bank's challenge is that its commitment letter conferred "reasonably equivalent value" on Intershoe, measured by the fair market value of the services it provided (i.e., the fees paid by Intershoe, which were consistent with "the going rate"). Additionally, Mellon Bank contends that the bankruptcy court failed to appreciate that commitment letters confer "value" to the extent that they provide a financially troubled company with the "chance" of obtaining financing that could save it from bankruptcy.

We agree that the factors underlying the totality of the circumstances test (e.g., fair market value, arm's-length relationship, and good faith) are simply not relevant to the initial question whether the commitment letter in this case conferred any value on Intershoe. We also agree that the mere "opportunity" to receive an economic benefit in the future constitutes "value" under the Code. As we explain more fully below, however, fatal to Mellon Bank's position is the bankruptcy

court's record-supported factual finding that the chances of the loan closing were negligible.  The court essentially found that Intershoe was exchanging substantial fees for an extremely remote opportunity to receive value in the future.  Because we agree that this minimal "value" was not "reasonably equivalent," to the lending fees Intershoe remitted to Mellon Bank, we will affirm the bankruptcy court's determination.

1.

a.

Both parties take issue with the bankruptcy court's totality of the circumstances test.  Accordingly, we turn first to the appropriate method of determining reasonably equivalent value.  The concept of reasonably equivalent value unfortunately has not been defined in the Code.  As the Supreme Court noted in BFP v. Resolution Trust Corp., "[o]f the three critical terms 'reasonably equivalent value', only the last is defined: 'value' means, for purposes of § 548, 'property, or satisfaction or securing of a . . . debt of the debtor' . . . ."  511 U.S. 531, ___, 114 S. Ct. 1757, 1760 (1994) (quoting 11 U.S.C. § 548(d)(2)(A)).  Thus, "Congress left to the courts the obligation of marking the scope and meaning of [reasonably equivalent value]."  In re Morris Communications NC, Inc., 914 F.2d 458, 466 (4th Cir. 1990).

The lack of a more precise definition has led to considerable difficulty.  This definitional problem is exacerbated in cases where, as here, the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain.  Because such intangibles are technically not within § 548(d)(2)(A)'s definition of "value," courts have struggled to develop a workable test for reasonably equivalent value.  See generally In re Young, 82 F.3d 1407 (8th Cir. 1996) (determining whether debtors obtained "value" in exchange for charitable contributions to church); In re Chomakos, 69 F.3d 769 (6th Cir. 1995) (examining whether debtors obtained "value" in exchange for $7,710 in gambling losses), cert. denied, 116 S. Ct. 1568 (1996); In re Morris Communications NC, Inc., 914 F.2d at 458 (attempting to determine "value" of shares in corporation whose only asset was a license application pending before the FCC that had a one in twenty-two chance of approval); In re Fairchild Aircraft Corp., 6 F.3d 1119, 1125-26 (5th Cir. 1993) (deciding whether money debtor spent in failed attempt to keep commuter airline afloat conferred "value" on the debtor).

In attempting to determine whether Mellon's commitment letter conferred any value on Intershoe, the bankruptcy court purported to apply a totality of the circumstances test.  Drawn from other reasonably equivalent value cases, that test takes into account the fair market value of the item received by, or services performed for, the debtor; the existence of an arm's-length relationship between the debtor and the transferee; and the good faith of the transferee.  These factors, however, have no bearing on whether any "value" was actually conferred on the debtor.  At most, the fair market value and the arm's-length nature of the relationship are relevant to the price the debtor paid.  But the price that the debtor paid, in and of itself, reveals nothing about

whether the debtor received something of actual "value."  A simple
example illustrates our point:

> Within one year of filing for bankruptcy, Dpays a window-washer
$1,000 to clean the
>> windows in an office building.  The $1,000
>> constitutes the going rate for such a job, and
>> the window-washer is unaware of D's financial
>> condition.

That the $1,000 D paid represents the fair market value of the
window-washer's services and that the transaction was at arm's
length say absolutely nothing about whether the debtor received
"value;" "value" was conferred because D obtained a palpable
benefit from the service performed--i.e., clean windows.

The bankruptcy court, therefore, conflated two inquiries
that should remain separate and distinct: before determining
whether the value was "reasonably equivalent" to what the debtor
gave up, the court must make an express factual determination as to
whether the debtor received any value at all.  The bankruptcy court
seemed to recognize this as it attempted to reconcile the totality
of the circumstances test with our analysis in Metro
Communications, Inc., 945 F.2d at 635.

b.

Metro Communications, Inc. involved a loan that Mellon
Bank provided to the acquiror in a leveraged buy-out ("LBO").  As
collateral for the LBO loan, Metro, the target of the LBO, gave
Mellon Bank a security interest and guarantee in substantially all
of its assets.  With the LBO loan, Mellon also provided a credit
facility to Metro, also secured by Metro's assets.  Less than one
year later, Metro sought protection under the Code.  A committee of
unsecured creditors brought an adversary proceeding alleging, inter
alia, that the granting of the security interests were
constructively fraudulent transfers under § 548(a)(2) of the Code.
The bankruptcy and district courts concluded that Metro had not
received reasonably equivalent value in exchange for the security
interests it provided to Mellon Bank.

In reversing, we observed that "[b]ecause Metro did not
receive the proceeds of the acquisition loan, it did not receive
any direct benefits from extending the guaranty and security
interest collateralizing that guaranty."  Id. at 646.
Nevertheless, we stressed that

> indirect benefits may also be evaluated. . . .
> These indirect economic benefits must be
> measured and then compared to the obligations
> the bankrupt incurred. . . . The touchstone is
> whether the transaction conferred realizable
> commercial value on the debtor reasonably
> equivalent to the realizable commercial value
> of the assets transferred.

Id. at 646-47 (emphasis added) (citations omitted).  We went on to
discover two indirect benefits that conferred "value" on Metro.
The first was Mellon Bank's extension of a credit facility to
Metro: "[t]he ability to borrow money has considerable value in the

commercial world. To quantify that value, however, is difficult. Quantification depends upon the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business." Id. at 647. The second indirect benefit created by Metro's granting of a security interest in its assets, which allowed the LBO to close, was a "legitimate and reasonableexpectation that the affiliation of these two corporations . . . would produce a strong synergy." Id. (emphasis added). Significantly, we found that the expected synergy created "value," even though an unforseen change in the law prevented it from becoming a reality.

### c.

In spite of the plain requirement that the debtor actually receive something of value, Mellon Bank continues to insist that the fair market value of services rendered is conclusively determinative of reasonably equivalent value. To support this contention it relies on the Supreme Court's recent decision in BFP v. Resolution Trust Corp., 511 U.S. at 531, 114 S. Ct. at 1757. BFP, of course, stands for no such proposition. The Court there held that the proceeds of a mortgage foreclosure sale conducted in accordance with state law constitute "reasonably equivalent value" as a matter of law, even where those proceeds are substantially below the fair market value of the real estate sold. The BFP Court noted in passing that "the 'reasonably equivalent value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context." 511 U.S. at ___, 114 S. Ct. at 1765.

The dictum in BFP does not help Mellon Bank, however, because in the real estate context there is no doubt that the debtor is receiving something of "value" (i.e., cash) in exchange for real property, which also has a measurable value. Thus, the real issue in BFP was not whether any value was exchanged, but rather whether the value obtained was "reasonably equivalent" to what was given up. Thus, BFP in no way alters the requirement that when the debtor transfers property--whether it be real estate or cash--it must receive something of "value" in return.

This is fully consistent with our decision in Metro Communications, Inc., 945 F.2d at 646, which noted that the fraudulent conveyance laws are intended to protect the debtor's creditors. Rejecting Mellon Bank's contention that the debtor had received "value" simply because the bank had parted with value by loaning funds, we said that "[t]he purpose of the laws is estate preservation; thus, the question whether the debtor receivedreasonable value must be determined from the standpoint of the creditors." Id. Mellon Bank's assertion in this case that it has conferred value simply because the fees it charged Intershoe represent the fair market value of Mellon Bank's services similarly misses the mark.

In sum, in light of our decision in Metro Communications, Inc., the bankruptcy court committed legal error to the extent that it applied a totality of the circumstances test to the initial question whether the commitment letter at issue conferred any value on Intershoe. To determine whether this threshold requirement was

satisfied, the court should have examined whether Intershoe received any benefit from the commitment letter, whether direct or indirect, without regard to the cost of Mellon Bank's services, the contractual and arm's-length nature of the relationship, and the good faith of the transferee.

2.

Its application of the totality of the circumstances test notwithstanding, the bankruptcy court announced two conclusions essential to the resolution of the question whether Intershoe had received any value in exchange for the commitment fees it had remitted to Mellon Bank. The court first determined that Mellon Bank's commitment letter did not confer any tangible, indirect benefits on Intershoe. For instance, the court found that Signet's extension of its credit facility beyond the original expiration date and the trade suppliers' decision to extend credit to Intershoe were not the direct result of Mellon Bank's willingness to lend funds to Intershoe. The court then determined that the loan commitment failed to confer any significant intangiblebenefits on Intershoe. Specifically, the court determined that the commitment letter essentially offered only a very slim "chance" of obtaining a substantial economic benefit in the future because it contained numerous conditions that, in all likelihood, could not have been satisfied.

With this latter determination the bankruptcy court implicitly held that money spent on an investment bearing a certain degree of risk can generate cognizable value within the meaning of § 548(a)(2) of the Code, even where the investment ultimately fails to generate a positive return. The Committee disputes this legal conclusion, arguing that money spent on a losing investment fails to confer "value" as a matter of law. If the Committee is correct, then we would be compelled to affirm since it is undisputed that Intershoe exchanged $515,000 in fees for a loan that never closed. Accordingly, we address this preliminary question before reviewing the propriety of the bankruptcy court's factual findings.

a.

Relying on the following language from our decision in Metro Communications, Inc., the Committee argues that where the debtor's financial condition either continues to deteriorate or fails to stabilize, money spent on a losing investment cannot confer "value" as a matter of law:

> The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.

945 F.2d at 647 (emphasis added). We disagree. The Committee's argument depends for its validity on the contention that the highlighted sentence is part and parcel of the Metro Communications, Inc. court's holding. If that were true, then our

Internal Operating Procedures would mandate an affirmance here, since it is clear that Intershoe's going concern value declined at the time of the disputed transfers to Mellon Bank. Kirk v. Raymark Indus., Inc., 61 F.3d 147, 168 (3d Cir. 1995) ("The holding of a panel in a reported opinion is binding on subsequent panels.") (internal quotation marks and alteration omitted) (quoting I.O.P. Rule 9.1). But we view the highlighted passage as providing an example of how a court can determine that a debtor received directbenefits and, thus, "value" from a transaction. Significantly, the court in Metro Communications, Inc. went on to discover several potential, intangible benefits that, although incapable of precise measurement, conferred value on Metro despite their failure to materialize. That should dispel any suggestion that Metro Communications, Inc. stands for the proposition that a debtor must receive a direct, tangible economic benefit in order to receive "value" for purposes of § 548(a)(2) of the Code.

Furthermore, were we literally to apply the highlighted statement from Metro Communications, Inc. as the categorical test for value under § 548(a)(2), we would announce a rule for this Circuit that only successful investments can confer value on a debtor. This would permit a court viewing the events with the benefit of hindsight to conclude that any transfer that did not bring in the actual, economic equivalent of what was given up fails to confer reasonably equivalent value as a matter of law. Such an unduly restrictive approach to reasonably equivalent value has been soundly rejected by other courts, Chomakos, 69 F.3d at 771 (gambling losses conferred value on debtor); Fairchild Aircraft Corp., 6 F.3d at 1119 (money spent in failed attempt to keep commuter airline afloat conferred value on debtor), and with good reason. Presumably the creditors whom § 548 was designed to protect want a debtor to take some risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code:

> According to [appellant], the only value that can be considered is property actually received. Under this view the value of an investment--no matter how large and how probable the potential return--cannot be considered unless it actually pays off, and only to the extent that it does so. . . . The narrow "realized property" approach to value advanced by [appellant] finds no approbation in the law.

Fairchild Aircraft Corp., 6 F.3d at 1126-27. Accordingly, we hold that money spent on investments that fail to stabilize or improve the debtor's condition (i.e., "losing" investments) can confer value within the meaning of § 548(a)(2) of the Code.

The question, then, is how to determine whether an investment that failed to generate a positive return nevertheless conferred value on the debtor. We think our decision in Metro Communications, Inc. answers this question implicitly. We held there that the mere expectation that the fusion of two companies would produce a strong synergy (an expectation that turned out to

be inaccurate in hindsight) would suffice to confer "value" so long as the expectation was "legitimate and reasonable." Id. at 647 (emphasis added). See id. ("The touchstone is whether the transaction conferred realizable commercial value on the debtor . . . .") (emphasis added). Thus, so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred. Accord Chomakos, 69 F.3d at 771 (because legalized gambling provides fair chance for significant pay-off, $7,710 in gambling losses conferred value on debtor); Fairchild Aircraft Corp., 6 F.3d at 1126 ($432,380.91 spent in failed attempt to keep commuter airline viable conferred value because "the likelihood that a sale would occur was also demonstrably high"); cf. Morris Communications NC, Inc., 914 F.2d at 458 (shares in a corporation whose only asset was a licensing application pending before the FCC with a one in twenty-two chance of approval had value).

We think our analysis appropriately balances a creditor's interest in estate preservation against a debtor's legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the Code altogether. As we noted above, requiring that all investments yield a positive return in order to find that they conferred value on the debtor would be unduly restrictive. But so, too, would a rule insulating from § 548's coverage investments that, when made, have zero probability of success. The best solution, therefore, is to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return. In this way creditors will be protected when an irresponsible debtor invests in a venture that is obviously doomed from the outset.

b.

With these legal principles in mind, our review of the bankruptcy court's conclusion that Intershoe did not receive reasonably equivalent value proceeds in two, discrete steps: first, we determine whether the commitment letter conferred any value on Intershoe; second, we consider the bankruptcy court's finding that whatever value was conferred was not "reasonably equivalent" to the two transfers of lending fees totaling $390,000 is clearly erroneous.

Although the bankruptcy court did not announce an explicit finding on the question whether Mellon Bank's commitment letter conferred any value on Intershoe, it is clear that the court implicitly answered that question in the affirmative. The bankruptcy court stated that "all parties should have known there was a substantial probability that the loan would not close[.]" Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Mellon Bank, N.A., No. 1-93-00137A, slip op. at 32 (Bankr. M.D. Pa. June 29, 1995) (emphasis added). Put another way, the court concluded that by November 7, 1991, there was a slight chance that the loan would close. This finding is amply supported by the record and, hence, cannot be disturbed on appeal. First, although TCR had not formally committed to participate in the deal, there is no evidence in the record that TCR had made known its intention to withdraw

before November 17, 1991.  Thus, as of November 7, 1991, when the commitment letter was executed and the disputed fees remitted, there was at least some chance that the most important condition in the letter could be fulfilled.  With respect to the other conditions in the letter, which pertained mainly to Intershoe's financial condition, record evidence reveals that, despite Intershoe's deteriorating condition, Mellon was willing to waive or modify many of these conditions.  Since we review the transaction at the time the transfer was made, In re Chomakos, 69 F.3d 770–71, the bankruptcy's court's implicit determination that the letter provided Intershoe with at least some chance of receiving a future economic benefit and, therefore, "value" is not clearly erroneous.

We next consider the bankruptcy court's determination that whatever value was conferred by the letter, it was not "reasonably equivalent" to the $390,000 in lending fees Intershoe paid to Mellon Bank.  We conclude that in assessing the reasonable equivalence issue, the bankruptcy court appropriately relied on the totality of the circumstances test.  See Barrett v. Commonwealth Fed. Sav. and Loan Ass'n, 939 F.2d 20, 22 (3d Cir. 1991); see alsoIn re Chomakos, 170 B.R. 585, 592 (Bankr. E.D. Mich. 1993), aff'd, 69 F.3d at 769 (both considering a variety of factors, including the fair market value compared to the actual price paid and the arm's-length nature of the transaction).

Mellon Bank insists that the court's findings that: (1) the fees Intershoe paid were in line with market rates; (2) Mellon Bank acted in good faith; and (3) for the most part, the parties dealt at arm's length, render clearly erroneous its conclusion that Intershoe did not receive value that was "reasonably equivalent." We disagree.  As our discussion of "value" should have made clear, supra III.A.2.a, while the chance of receiving an economic benefit is sufficient to constitute "value," the size of the chance is directly correlated with the amount of "value" conferred.  Thus, essential to a proper application of the totality of the circumstances test in this case is a comparison between the value that was conferred and fees Intershoe paid.  Metro Communications, Inc., 945 F.2d at 646 ("indirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred").

So understood, the bankruptcy court's conclusion that the chance of receiving value represented by the commitment letter was so small that it was not reasonably equivalent to the $390,000 in fees Intershoe paid in no way conflicts with the court's observation that the commitment fees were in line with market rates.  The bankruptcy court concluded that while a debtor reasonably might pay $390,000 in fees for a real chance to obtain a $53 million credit facility, the commitment letter at issue in this case was so conditional that it provided Intershoe with little chance, if any, to obtain the loan it sought.  Accordingly, as long as there is support in the record for the bankruptcy court's conclusion that the commitment letter was highly conditional (and, thus, of little "value"), we must affirm.

That the loan was highly conditional cannot seriously be disputed.  The bankruptcy court concluded that "both transfers were made in exchange for a highly conditional loan commitment, and all parties should have known there was a substantial probability that

the loan would not close."  Official Comm. of Unsecured Creditors of R.M.L., Inc., No. 1-93-00137A, slip op. at 32.  Significantly, the court found that "TCR had made no commitment to participate in the transaction and Intershoe's deteriorating financial condition was a deterrent to an equity investor."  Id. at 30.  The court further stated that "there was a significant possibility that Intershoe could not meet one or more of the conditions of the commitment letter, including the TCR equity investment."  Id. at 31 n.17.  Finally, the court noted that "Intershoe's financial survival was contingent upon the Mellon refinancing and the Mellon refinancing was contingent upon dozens of conditions, the least certain and most important of which was an equity infusion from TCR."  Id. at 16.  Since all of these findings have ample support in the record, the bankruptcy court's conclusion that the commitment letter conferred minimal value--value that was not reasonably equivalent to the fees Intershoe paid--is not clearly erroneous.

We acknowledge that the measurement and comparison called for by Metro Communications, Inc. is no easy task.  Indeed, we noted in that case that "[t]he ability to borrow money has considerable value in the commercial world.  To quantify that value, however, is difficult."  945 F.2d at 647.  Yet we expressed no reservations about the bankruptcy courts' ability to analyze such potential, intangible benefits.  We also acknowledge that whether a contemplated investment provided a significant "chance" to receive value more often than not will be bound up in the bankruptcy court's factual determinations and, thus, largely immune from attack on appeal.  But this is as it should be; the bankruptcy court, with its unique expertise, is in far better position than either the district courts, sitting as appellate tribunals, or the courts of appeals to make such determinations.  See generally In re Fairchild Aircraft Corp., 6 F.3d at 1125 n.5 (noting that fairness of consideration received is a "fact-laden" inquiry that ought to be reviewed deferentially).

In sum, because Intershoe expended $390,000 in commitment fees for a loan that had little chance of closing, we agree that the Committee met its burden of establishing that Intershoe failed to receive reasonably equivalent value.

## B.
### Insolvency

Mellon Bank next contends that the Committee failed to establish that Intershoe was "insolvent," see 11 U.S.C. § 548(a)(2)(B)(i), on the dates of the disputed transfers.  Section 101(32)(A) of the Code defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."  11 U.S.C. § 101(32)(A).  For purposes of § 548, solvency is measured at the time the debtor transferred value, not at some later or earlier time.  Metro Communications, Inc., 945 F.2d at 648.  This is known as the "balance sheet" test: "assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets."  Id. (emphasis added).

Mellon Bank's principal argument is that the bankruptcy court inappropriately relied on an audited, year-end financial statement indicating that Intershoe had a net worth of negative $4

million as of August 31, 1991. That financial statement was prepared several months after the disputed transfers were made and, according to Mellon Bank, reflected "substantial adjustments" that were "precipitated by the collapse of the Mellon-TCR transaction . . . ." Mellon Bank's Br. at 41. But for that unexpected collapse, Mellon Bank argues, several alleged "credits" Intershoe was carrying on its books rendered it solvent, at least on paper, at the time it remitted the disputed commitment fees to Mellon Bank. In short, Mellon bank accuses the bankruptcy court of relying on hindsight to conclude that Intershoe was insolvent in October through November of 1991. This argument need not detain us long.

The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's "insolvency" element has been criticized by courts and commentators alike. See, e.g., Credit Managers Ass'n of S. California v. Federal Co., 629 F. Supp. 175, 186 (C.D. Cal. 1985) (looking at whether projected cash flows were reasonable when made, not whether they ultimately panned out); Ohio Corrugating Co. v. DPAC, Inc., 91 B.R. 430, 438 (Bankr. N.D. Ohio 1988) ("The court feels that participants in an LBO must be protected from the perfect hindsight often evidenced in creditors' subsequent attacks on the corporate buyout."); Raymond J. Blackwood, Note, Applying Fraudulent Conveyance Law to Leveraged Buyouts, 42 Duke L.J. 340, 381 (1992) ("[C]ourts should take care not to indulge in hindsight."); Kenneth C. Kettering, The Pennsylvania Uniform Fraudulent Transfer Act, 65 Pa. B.A. Q. 67, 75 (1994) ("The debtor should not be responsible as a matter of hindsight for developments that could not reasonably have been foreseen at the time of the transfer.").

Hindsight, however, is not what prompted the bankruptcy court to ignore certain alleged "credits" and, thus, conclude that Intershoe was insolvent. On the contrary, and as Mellon Bank acknowledges, at least two alleged "credits," which together totaled $4.3 million, depended for their validity on Intershoe's belief that the loan would close. As we have already discussed, the bankruptcy court found, as a matter of fact, that Intershoe knew or should have known that its deteriorating financial condition would preclude it from meeting one or more of the conditions in the commitment letter:

> By all accounts, Intershoe's financial survival was contingent upon the Mellon refinancing and the Mellon refinancing was contingent upon dozens of conditions, the least certain and most important of which was an equity infusion from TCR. TCR had made no commitment to go through with the investment, and, more importantly, the financial numbers coming out of Intershoe in September, October and November of 1991, showed a deteriorating financial condition that would cause serious concern to a potential equity investor. . . . [T]he evidence was persuasive that TCR's participation was sufficiently uncertain that anticipated consummation of the equity investment and ultimately the Intershoe/Mellon

> transaction should not be the basis for
> upholding book entries that ultimately turned
> out to have no basis in reality.

Official Comm. of Unsecured Creditors of R.M.L., Inc., No. 1-93-00137A, slip op. at 16 (emphasis added).  This conclusion is fatal to Mellon Bank's position.  The bankruptcy court correctly determined that a debtor's creative accounting practices, which have the effect of grossly overstating its financial condition, cannot be the basis of a court's solvency analysis.

Furthermore, if a debtor's treatment of an item as an "asset" depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint.  See, e.g., In Re Xonics Photochemical, Inc., 841 F.2d 198 (7th Cir. 1988) ("the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities").  Such an analysis is by no means unknown to the law.  See generally Basic, Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978 (1988) (adopting test from SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S. Ct. 1454 (1969), that materiality of contingent corporate event is determined by balancing probability of event occurring against its anticipated magnitude).  Far from "hindsight" or "post-hoc" analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable.  The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers.

In this case, moreover, Daniel Coffey, a certified public accountant who served as the Committee's insolvency expert, revealed that in the course of performing an audit, accountants abide by a far more stringent rule.  Mr. Coffey testified that "in reality, if an auditor didn't think there was a real 99 percent chance that this loan is going to close, they wouldn't leave [the "credits"] on the balance sheet.  Everybody would say let's sit and wait and see what happens."  App. at 1610.  Since the bankruptcy court found that the probability of the loan closing was essentially zero, a finding we have already determined is amply supported by the record, the court properly discounted (to zero) the $4.3 million Intershoe had carried on its balance sheet as alleged "assets."  Thus, by November of 1991, Intershoe's actual assets were $4.3 million lower than its balance sheet had reflected.

Apart from properly refusing to consider $4.3 million as assets, the bankruptcy court also reversed a $4.5 million "asset" that Intershoe had carried on its books as a credit due from factory suppliers related to defective merchandise:

> there was no credible evidence offered to
> substantiate the book-entry for alleged
> credits from Intershoe's suppliers.  Even in
> absence of the testimony that adjustments were

> warranted by GAAP and GAAS, based upon the
> evidence, I find it entirely appropriate to
> make downward adjustments to Intershoe's then-
> value to write off [this] alleged asset[].

Official Comm. of Unsecured Creditors of R.M.L., Inc., No. 1-93-00137A, slip op. at 18.  Far from relying upon hindsight, the court concluded that this entry had no basis in fact when it was made. As Intershoe was unable to produce any documentation to support this alleged "credit," the bankruptcy court's decision to ignore the credit is amply supported by the record and, hence, not clearly erroneous.

In sum, Intershoe was found to have a net worth of negative $4 million on August 31, 1991, and negative $8 million on November 15, 1991.  The bankruptcy court properly refused to consider various items totaling $8.8 million that Intershoe had attempted to portray as assets.  Since the transfers at issue here occurred on November 7, 1991, the bankruptcy court's insolvency determination will be affirmed.

IV.

The judgment of the district court affirming the order of the bankruptcy court will be affirmed in all respects.