In re BCP MANAGEMENT, INC., a Delaware Corporation, Debtor.

BCPM Liquidating LLC, Successor In Interest to Debtor BCP Management, Inc., Plaintiff,

v.

PricewaterhouseCoopers LLP, Defendant.

Bankruptcy No. 02–10875(PJW).

Adversary No. 04–53101(PJW).

United States Bankruptcy Court, D. Delaware.

Feb. 8, 2005.

Robert J. Stearn, Jr., Marcos A. Ramos, Richards, Layton & Finger, P.A., Wilmington, DE, Christopher K. Kiplok, Hughes, Hubbard & Reed LLP, New York, N.Y. for PricewaterhouseCoopers LLP.

Mark Minuti, Jeremy W. Ryan, Saul Ewing LLP, Wilmington, DE, Timothy E. Hoeffner, Saul Ewing LLP, Philadelphia, PA, for BCPM Liquidating LLC.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is with respect to defendant PricewaterhouseCoopers LLP's ("PwC") motion (Doc. # 12) to dismiss the complaint in the above referenced adversary proceeding. For the reasons set forth below, the motion will be denied, subject to a limited exception.

## BACKGROUND

In 1987, Borden, Inc. formed a limited partnership to own and operate various facilities that manufactured and distributed, among other things, basic chemical and polyvinyl chloride resins. The operating entity, a Delaware limited partnership, was known as Borden Chemicals and Plastics Operating Limited Partnership ("BCP"). A second Delaware limited partnership known as Borden Chemicals and Plastics Limited Partnership ("LP") was formed by Borden, Inc. to be a limited partner of BCP. LP had no operations of its own, and did not participate in the operation, management or control of BCP's business. BCP Management, Inc. ("BCPM") was incorporated in Delaware on August 6, 1987. Its purpose, as amended, was to act as the general partner of BCP and LP. BCPM's sole activity was the management of BCP, the operating entity.

On April 3, 2001, BCP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code").[1] Almost a year later, on March 22, 2002, BCPM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Prior to BCP's and BCPM's respective petition dates, PwC provided accounting services to both BCP and BCPM beginning in at least 1987. During the fiscal year 1999, BCP started the implementation of a computer software accounting system provided by JD Edwards ("JDE"). In addition to its accounting services, PwC undertook to monitor and evaluate the JDE system in late 1999.

---

1. Individual sections of the Bankruptcy Code will be cited herein as " § ___".

*PwC's Retention*

On September 19, 2002, BCPM filed an application to retain PwC to provide accounting services during the chapter 11 case. In the retention motion, BCPM disclosed certain payments made to PwC during the 90–day preference period but represented that there was no conflict of interest. On October 18, 2002, the U.S. Trustee filed an objection to the retention of PwC because of concern over possible conflicts of interest and the need for specifics regarding the payments made during the 90–day preference period. On November 5, 2002, BCPM informed the Court that the U.S. Trustee had withdrawn its objection after receiving additional information from BCPM and PwC. The Court signed an order the same day granting the application to retain PwC. On February 3, 2003, BCPM filed a motion to effectuate PwC's retention nunc pro tunc to August 6, 2002. The Court entered an order granting this relief on February 26, 2003.

*The Plan*

On February 5, 2003, the Court entered an order confirming the third amended joint plan of BCP and BCPM (the "Plan"). Among other things, the Plan assigned all of BCP's claims and causes of action to BCP Liquidating LLC ("BCP LLC") and assigned all of BCPM's claims and causes of action to BCPM Liquidating LLC ("BCPM LLC").

Pertinent to the instant matter and as is discussed in detail below, the Plan contained an exculpation clause for specified professionals who rendered services in connection with the bankruptcy cases. In addition, there was an exhibit to the Plan that preserved various causes of action.

*BCP LLC's Preference Action*

On April 1, 2003, BCP LLC commenced an adversary proceeding action against PwC to recover alleged preferential trans-

fers made by BCP totaling $700,509.20. On November 7, 2003, BCP LLC and PwC entered into a settlement agreement with respect to that preference action. As part of the settlement, PwC made a $290,000 payment to BCP LLC and received a general release of all of BCP's claims against PwC.

*The Instant Action*

On March 20, 2004, BCPM LLC filed the complaint (the "Complaint") in this adversary proceeding seeking to recover the following amounts: $427,958.70 as preference transfers pursuant to § 547 and $1,277,572.70 as fraudulent transfers either pursuant to § 548 or § 544 and corresponding state laws. According to the Complaint, these amounts are payments made directly by BCPM to PwC. The Complaint also seeks $2,500,000 as damages allegedly resulting from PwC's negligence in the performance of its prepetition services to BCPM.

In the Complaint, BCPM LLC alleges that PwC became aware that the JDE system was not working properly at least as early as the end of 1999, and was aware of ongoing problems with the JDE system throughout 2000 and 2001. Despite this alleged knowledge, PwC issued "clean" opinions on the 1999 and 2000 financial statements of BCP and failed to issue management letters regarding the JDE system problems. In August 2001, BCP publicly announced accounting irregularities and subsequently restated its 2000 and first quarter of 2001 financial statements.

PwC's motion papers set forth the following grounds upon which it asserts it is entitled to have the Complaint dismissed: the negligence claim is derivative of BCP such that BCPM LLC lacks standing to assert it; the claims are precluded by BCP LLC's release of claims or by the Plan's exculpation clause; the Complaint should be dismissed either by reason of res judi-

cata or estoppel; and BCPM LLC has failed to properly plead the elements of a fraudulent conveyance action. BCPM LLC contests all of these assertions.

## DISCUSSION

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) serves to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). When deciding such a motion, the Court accepts as true all allegations in the complaint and draws all reasonable inferences from it which the Court considers in a light most favorable to the plaintiffs. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997); *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir.1989). The Court should not grant a Rule 12(b)(6) motion "unless it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### Direct or Derivative Action

PwC argues that BCPM LLC as successor to BCPM, the general partner, is not in a position to allege negligence against the firm that provided accounting services to BCP, the partnership. According to PwC, any alleged injury stemming from PwC's accounting services flowed to the partnership, not to any one partner individually, and were accordingly released through PwC's November 7, 2003 settlement with BCP LLC, the successor to the partnership. PwC also argues that under the terms of the Plan the claims were released.

■ An individual partner may not bring a claim in its own name that seeks recovery of a wrong inflicted upon the partnership. *See, e.g., Handelsman v. Bedford Village Assocs., Ltd. P'ship*, 213 F.3d 48, 54 (2d Cir.2000)("a partnership cause of action belongs only to the partnership itself"); *Creek v. Village of Westhaven*, 80 F.3d 186, 191 (7th Cir.1996)("a partner may not sue individually to recover for damages for an injury to the partnership"); *Cates v. Int'l Tel. and Tel. Corp.*, 756 F.2d 1161, 1176 (5th Cir. 1985)("even a single partner may not" bring suit on the partnership's behalf)(citing cases).

■ PwC relies on a recent Delaware Supreme Court ruling that it asserts clarifies the standard for determining whether an alleged claim is direct of a partner or derivative of the partnership. In *Tooley v. Donaldson, Lufkin & Jenrette*, the court held:

> That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

845 A.2d 1031, 1033 (Del.2004)(emphasis in original). Accordingly, PwC asserts that to survive a motion to dismiss, the Complaint must allege an injury that is independent of an injury to BCP.

> That is, a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation.

*Id.* at 1039.

PwC argues that the Complaint's negligence allegations are devoid of any inference of an alleged harm to BCPM independent of harm to BCP. I disagree.

■ Contrary to PwC's assertions, the Complaint alleges, and at this stage the Court must accept as true, that BCPM had a separate engagement with PwC. The Complaint states that PwC provided services to both BCP and BCPM. (Doc. # 1, ¶ 12.) The Complaint further alleges that BCP did not employ any persons and that BCPM employed and provided the officers, directors and employees to operate and manage BCP. (*Id.* at ¶ 13.) "[PwC] reported, with respect to its engagement, to the Audit Committee of the Board of Directors of BCPM." (*Id.*) Because of the separate engagement by BCPM, the Complaint asserts that "[PwC] owed a duty to BCPM to act with the care and skill reasonably expected of a professional auditor and accounting firm." (*Id.*) I read the negligence count as seeking to recover amounts transferred to PwC by BCPM as payments for services rendered to BCPM and seeking reimbursement to BCPM for other expenses incurred by BCPM because of PwC's alleged unsatisfactory performance. With regard to the latter, the Complaint asserts that "[BCPM] incurred significant additional fees and expenses in connection with investigations which became necessary in order to determine the amount of the misstatements and to complete work that should have been completed as part of [PwC]'s ordinary audit work." (*Id.* at ¶ 20.)

My reading of the Complaint is that BCPM LLC is not alleging that negligent performance caused injury to BCPM with respect to its investment/equity interest in BCP. Rather, it is alleging that BCPM paid PwC to perform professional services for BCPM and those services were negligently performed such that PwC should be required to respond in the form of a disgorgement of the payments and also to make BCPM LLC whole with respect to expenses incurred by BCPM in paying for alternative accounting professionals to correct what PwC allegedly did wrong.

Contrasting this action with the preference action pursued by BCP LLC further demonstrates the direct nature of this action. In its preference action, BCP LLC sought to recover payments made by BCP to PwC for services rendered by it to BCP. In contrast, this action was commenced by BCPM LLC to recover payments made directly by BCPM to PwC for services rendered by it to BCPM. This clearly suggests the existence of two separate engagements and supports a finding of a direct cause of action for BCPM.

In this regard, one can imagine a scenario in which two accounting firms were employed, with one performing services for BCP, for example PwC, and another performing services for BCPM, for example KPMG. In this situation, it would be undisputed that KPMG owed duties directly to BCPM and that BCPM LLC would have standing to assert any potential claims existing against KPMG, be it for negligence or any other cause of action arising out of the relationship. This is the scenario pleaded in the Complaint with the exception that the two separate entities employed the same accounting firm.

In its reply memorandum, PwC repeatedly asserts that for its services PwC was paid by BCP not BCPM. In light of the plain language of the complaints, I do not know how this assertion can be made by PwC. The BCP LLC complaint recites: "[BCP] made transfers of its property in the aggregate amount of $700,509.20 (the 'Transfers') to or for the benefit of [PwC]. Details concerning the Transfers are set forth on Exhibit 'A' attached hereto." (Doc. # 14, Exh. J, ¶ 10.) Exhibit A to that complaint identifies 14 transfers dating from January 30, 2001 through March 26, 2001 aggregating $700,509.20. In contrast, the Complaint alleges that "[o]n or

within ninety (90) days before the Petition Date, [BCPM] made transfers (the 'Preferential Transfers') of its property in the aggregate amount of $427,658.70 to or for the benefit of PwC, a creditor at the time of each transfer. Details concerning the Preferential Transfers are set forth on Exhibit A attached hereto." (Doc. # 1, ¶ 22.) Exhibit A to the Complaint identifies four separate transfers made from March 8, 2002 through March 19, 2002 in the aggregate amount of $427,958.70. Thus, the Complaint clearly identifies BCPM as the payor with respect to transfers not identified as being the subject of the BCP LLC complaint. Indeed, all of the BCPM transfers identified in the Complaint took place after BCP filed its bankruptcy petition and PwC was not retained as a professional in the BCP chapter case.

The second *Tooley* factor examines which party would be entitled to any recovery ultimately obtained in the lawsuit. In this case, since BCPM made the payments or incurred the expenses, BCPM LLC alone would be entitled to any recovery. Following up on the hypothetical discussed above, this conclusion seems clear. Had BCPM made payments to the second accounting firm, there would be no question but that BCPM would have been entitled to recover for any failure of performance by that firm.

Thus, I conclude that the Complaint asserts a negligence claim belonging to BCPM, not BCP, and assigned to BCPM LLC.

**Settlement Agreement Release and Plan Exculpation**

As its second argument for dismissal of the Complaint, PwC asserts that any BCPM claims were released as part of the November 7, 2003 settlement agreement between BCP LLC and PwC which resolved the BCP LLC preference action against PwC.

■ The intent of settling parties and the specific language contained in a release provision determine the claims and parties to which the release will apply. *See, e.g., Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc. (In re Am. Sweeteners, Inc.),* 248 B.R. 271, 277–78 (Bankr.E.D.Pa.2000) (because a release of claims was silent as to an equitable subordination claim, and because evidence did not suggest an intent to release all bankruptcy rights, the claim was not precluded). For this reason, this Court has previously stated that if parties intended a result different from that dictated by the express and unambiguous provisions of a release, "they could have easily so provided." *Wilmington Trust Co. v. Calhoun (In re Geotek Communications, Inc.),* 282 B.R. 165, 169 (Bankr. D.Del.2002). "The fact that they did not indicates their intent that [the release] be interpreted in accordance with its plain language . . . ." *Id.*

■ In this case, the plain language of the BCP LLP release does not suggest an intent to extend its reach to claims belonging to BCP's general partner, BCPM. The specific language of the release indicates a clear intent to make BCP LLP, and only BCP LLP, as successor to BCP, a party to the release. The release provision states:

Upon receipt and negotiation of the settlement payment, *BCP* releases, acquits and forever discharges *PWC, its predecessors, successors and assigns, and each and every past and present agent, servant, partner, principal, employee and representative of PWC* from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, that BCP may have or claim to have now or

which may hereafter rise out of or be connected with any facts, transactions, events or occurrences existing or occurring prior to the date of this Agreement.

(Doc. # 14, Exh. K, at 2 (emphasis added).) The language of the release is clear that the only entity releasing claims was BCP LLP. The parties knew how to expand the terms beyond the two entities involved as is demonstrated by the language covering all PwC entities, including its partners. If there were similar language with regard to BCP, clearly the general partner, BCPM, would be covered. But the language is not broad enough to cover BCPM's independent claims.

■ Similarly, PwC argues that the exculpation provision of the Plan releases PwC from liability to BCPM on the asserted negligence claims. However, the language of the exculpation provision itself provides no support for this contention. PwC cites the following provision from the Plan:

BCP, BCP Finance and BCPM; the officers, directors and employees of BCP, BCP Finance and BCPM; BCP Liquidating LLC; BCPM Liquidating LLC; the BCP LLC Agent; the BCPM LLC Agent; the BCP LLC Managers; BCPM LLC Managers; the Disbursing Agent; the BCP/BCP Finance Professionals ... The BCPM Professionals ...; Kramer, Levin, Naftalis & Frankel; Reed Smith LLP; Chanin Capital Partners; Curtis, Mallet–Prevost, Colt & Mosle LLP, Saul Ewing and BDO Seidman, LLP shall neither have nor incur any liability to any Person or entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan, the Disclosure Statement, any contract, instrument, release or other

agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken in connection with the Debtors' Chapter 11 cases; *provided, however,* that the foregoing provisions of Section XI.A of the Plan will have no effect on: (1) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (2) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligent or willful misconduct.

(Doc. # 14, Exh. N, Section XI.A, p. 48.) This is a garden variety release typically found in chapter 11 plans. It does not provide a general release, but rather shields the named individuals and entities from claims arising from "any act taken or omitted to be taken in connection with the Debtors' Chapter 11 cases." (*Id.*)

The Complaint does not arise in connection the chapter 11 cases. Rather, it stems solely from PwC's alleged conduct in performing services and receiving payments predating the commencement of BCPM's chapter 11 case. As a result, BCPM LLC's claims are not precluded by the terms of the exculpation provision in the Plan.

Moreover, the Plan contains more specific provisions delineating those causes of action intended to be preserved upon confirmation of the Plan. Specifically, the Plan preserves:

Any and all causes of action arising from or related to agreements, transactions, or relationships between BCP *or BCPM* and their respective consultants, advis-

ors, technicians, engineers, experts, *accountants, auditors, financial advisors,* legal advisers and other service-providers, including without limitation Professionals, "ordinary course" professionals and other professionals, all except to the extent set forth in the Plan.

(Doc. # 14, Exh. V.E to Exh. N, ¶ 28.) In addition, the Plan explicitly preserves "[a]ny and all causes of action ... for avoidance of preferences" and "for avoidance of fraudulent transfers and obligations." (*Id.* at ¶¶ 5–6.) This language demonstrates a clear intent to preserve all claims against PwC.

**Res judicata and Estoppel**

PwC argues that BCPM's prior positions expressed in its application to retain PwC in the chapter case and this Court's orders relating to that retention require dismissal on grounds of res judicata, judicial estoppel and equitable estoppel.

PwC details the facts underlying this argument as follows:

> On September 19, 2002, BCPM applied to retain PwC to perform, among other services, the audits of the Partnership's financial statements and tax services for the Partnership and LP.[2] BCPM disclosed payments made to PwC during its 90–day preference period and represented that it did not have any conflicts of interest with PwC.
>
> On October 18, 2002, the U.S. Trustee filed an objection to BCPM's retention of PwC, raising issues concerning possible conflicts of interest and the nature of certain payments received by PwC during the 90–day preference period, among other issues. As the U.S. Trustee explained, "information is needed to determine whether PwC is a 'disinterested

person' ... and whether PwC holds or represents an interest adverse to the interests of the Debtor and its estate." The U.S. Trustee emphasized that BCPM must meet "its burden of proof" on these issues.

> On November 5, 2002, BCPM represented that, based upon additional information supplied, the U.S. Trustee had withdrawn its objection. BCPM submitted a proposed order, which the Court signed the same day, acknowledging that it had considered the retention application and the U.S. Trustee objection, and adopting BCPM's representations that "PwC does not hold or represent an interest adverse to the Debtor's estate;" that it is a "disinterested person;" and that its employment is in the "best interests of the Debtor and its estate."

(Doc. # 13, pp. 4–5.) Subsequently, on February 26, 2003 the Court entered another PwC retention order nunc pro tunc to August 6, 2002.

Applying the law to these facts PwC goes on to argue as follows.

As to res judicata, PwC asserts:

> To apply, the doctrine [of res judicata] requires: "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." Here, Plaintiff must be precluded from prosecuting its claims because: (1) the Orders approving PwC's retention and fee applications are final judgments on the merits; (2) Plaintiff is in privity with BCPM; and (3) Plaintiff is attempting to raise claims that had actually been raised by the U.S. Trustee and could have (and should have) been

---

**2.** In the interest of brevity, I am omitting from the quoted material the record citations made by PwC in its motion papers.

raised by BCPM in connection with PwC's retention and fee applications.

(*Id.* at 14 (citation omitted).)

As to the third element of the res judicata defense, PwC argues:

Finally, the Complaint fulfills the requirement that there be a "subsequent suit" on "the same cause of action." ... [C]ourts "scrutinize the totality of the circumstances in each action" to determine whether "there is an 'essential similarity of the underlying events giving rise to the various legal claims.' "

Here, the "essential similarity" between the retention applications and fee applications, on the one hand, and the Complaint, on the other hand, is manifest. To be retained under the Bankruptcy Code, a professional must "not hold or represent an interest adverse to the estate" and must be "disinterested." Thus, this Court concluded on two separate occasions, the first time after objection by the U.S. Trustee and the second time after disclosure of the "Accounting Issues" in the Disclosure Statement, that PwC was "disinterested" and that PwC *did not* "hold or represent an interest adverse to the estate." In contrast, a ruling on the instant motion would necessarily hold the exact opposite—that, notwithstanding prior court orders, PwC "hold[s] intrest[s] materially adverse to the interest of the estate," and is not disinterested.

(*Id.* at 15–16 (emphasis in original) (citations omitted).)

As to judicial estoppel, PwC asserts:

Three factors determine whether the doctrine applies: (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether there has been judicial acceptance of the earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Here, BCPM represented that "there [was] no dispute that PwC is a disinterested person ... and meets all the requirements of Section 327(a)." The Court accepted this position in its Retention Orders.

\* \* \* \* \* \*

Plaintiff cannot have it both ways in Federal Court– it cannot at once represent that PwC held no adverse interest and that PwC's expertise and knowledge were beneficial to the estate at the same time it would accuse PwC of negligence and receiving fraudulent transfers in periods well *prior* to the time BCPM retained PwC. BCPM derived unfair advantages in gaining accounting services requiring PwC's independence.

(*Id.* at 17 (emphasis in original) (citations omitted).)

As to equitable estoppel, PwC asserts:

The doctrine of equitable estoppel prohibits a party from denying facts that it has previously asserted to be true if the party to whom the representation was made has relied on the representation and would be prejudiced by its repudiation.

PwC reasonably relied on BCPM's representations.

(*Id.* at 18 (citation omitted).)

In its reply brief, PwC restates its argument as follows:

In the context of an objection by the United States Trustee seeking "to determine whether PwC is a 'disinterested person' " specifically directed to PwC's independence and receipt of payments within 90 days of the filing, BCPM and PwC disclosed PwC's past services and the engagement letters under such services were performed. They also specif-

ically enumerated the payments to PwC during the preference period and the circumstances surrounding each such payment.... This Court, "having determined the legal and factual basis set forth in the [retention application pleadings]" made specific findings that "PwC does not hold or represent an interest adverse to the Debtor's estate and is a 'disinterested person[.]' "

(Doc. # 18, pp. 9–10.)

While I do not take serious issue with PwC's statement of the law of res judicata and estoppel, I find PwC's recitation of the facts regarding the retention process materially deficient. Indeed, as detailed below, based on PwC's involvement in the retention process and if the statements in the Complaint regarding the dates and amounts of the 90–day transfers are correct (and at this stage I must assume they are), PwC itself appears to have misled the Court.

Count I of the Complaint alleges § 547 preferential transfers in the amount of $427,958.70. Other counts allege fraudulent transfers pursuant to § 548 and § 544, with each count in the aggregate amount of $1,277,572.70. This latter number is a combination of the $427,958.70 transfers made in the 90 days prepetition together with an aggregate of $849,614 of transfers made between 90 days and one year prior to the petition date. Exhibit A to the Complaint identifies the 90–day transfers as follows:

| Payment Date | Payment Amount |
| --- | --- |
| 03/19/2002 | $ 54,158.00 |
| 03/18/2002 | $ 25,250.00 |
| 03/14/2002 | $285,165.70 |
| 03/08/2002 | $ 63,385.00 |
| Total | $427,958.70 |

The chronology leading up to the retention order shows the following:

The PwC retention application (Case Doc. # 242)[3] was filed by BCPM on September 19, 2002. The application states the following:

In support of this Application, the debtor submits (a) the Affidavit of Steven J. Barr, a partner of PWC, a copy of which is attached hereto as Exhibit A and incorporated herein by reference, and (b) PWC's Disclosure of Compensation (the "Disclosure of Compensation"), a copy of which is attached hereto as Exhibit B and incorporated herein by reference ....

(Case Doc. # 242, p. 1.)

The application then recites the following:

Prior to the Petition Date, the Debtor paid PWC for certain accounting services rendered or to be rendered on behalf of the Debtor. The Debtor made the following payments to PWC during the ninety (90) days immediately preceding the Petition Date:

| Date | Amount[4] |
| --- | --- |
| 1/10/02 | $130,000.00 |
| 02/06/02 | $ 5,588.10 |
| 03/19/02 [5] | $ 25,250.00 |
| 03/20/02 [6] | $ 54,158.00 |

(*Id.* at ¶ 11.)

The affidavit of Steven J. Barr, a partner of PwC, attached as Exhibit A contains the following statement:

According to PricewaterhouseCoopers' books and records, during the ninety day period prior to the Debtor's' [sic]

---

3. Documents appearing in the BCPM's chapter case are cited "Case Doc. # ___".

4. These numbers total $214,996.10.

5. In the Complaint this transfer amount is dated 03/18/02.

6. In the Complaint this transfer amount is dated 03/19/02.

petition date, PricewaterhouseCoopers received $214,996.10 from the Debtor for professional services performed and expenses incurred.

(Case Doc. # 242, Exh. A, ¶ 10.)

PwC's Disclosure of Compensation attached as Exhibit B contains the following statement by Barr:

> The Debtor made the following payments to PricewaterhouseCoopers during the ninety day period immediately preceding the Petition Date:
>
> | Date | Amount [7] |
> |------|---------|
> | 1/10/02 | $130,000 |
> | 2/06/02 | $5,588.10 |
> | 3/19/02 | $25,250 |
> | 3/20/02 | $54,158 |

(Case Doc. # 242, Exh. B, ¶ 2.)

The U.S. Trustee's objection to the retention application asserts the following:

> The Application and Affidavit disclose certain payments received by PWC from the Debtor in the ninety (90) days preceding the bankruptcy. There is no information provided, however, regarding when the services were performed that gave rise to the debt for which these payments were made. This information is needed to determine whether PWC is a "disinterested person" as that term is defined in the Bankruptcy Code, and whether PWC holds or represents an interest adverse to the interests of the Debtor and its estate.

(Case Doc. # 274, ¶ 12.)

In response to the U.S. Trustee's objection, on November 4, 2002 Barr filed a supplemental affidavit containing the following representation:

> Paragraph 11 of the application, paragraph 10 of the Affidavit, and Exhibit "B" attached to the Affidavit, "Disclosure of Compensation of PricewaterhouseCoopers LLP in Accordance with Section 329 of the Bankruptcy Code, Rule 2016(b) of the Federal Rules of Bankruptcy Procedure and rule 2016–1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware", disclosed that PricewaterhouseCoopers received the aggregate sum of $214,996.10 from the Debtor during the 90 days prior to the March 22, 2002 petition date (the "Preference Period").

Such sum was comprised of the following payments:

| Payment Date | Amount | Description |
|--------------|--------|-------------|
| 1/10/02 | $130,000 | Payment was for K–1 Partnership tax return work and was payable in January 2002 pursuant to executed engagement letter dated October 23, 2001. Invoice was issued in January 2002. |
| 02/06/02 | $5,588.10 | Payment was for tax bridge services performed in January 2002. Invoice was issued in January 2002. |
| 03/19/02 | $25,250.00 | Payment was for tax return preparation performed in January and February 2002. Invoices were issued in November 2001 and January 2002. |
| 03/20/02 | $21,993.00 [8] | Payment was for tax consulting services completed in February 2002. Invoice was issued in February 2002. |

7. These numbers total $214,996.10.

8. These two payments on the same date total $54,218 and presumably represent the same 03/20/02 transfer identified in PwC's Disclosure Compensation as $54,158. With that correction, the total of all these identified transfers is $214,996.10.

| 03/20/02 | $32,225.00 [8] | Payment was for the audit of Borden Chemicals and Plastics Limited Partnership financial statements for which services were performed in February and March 2002. Invoice was issued in March 2002. |

(Case Doc. # 296, ¶ 6.)

The finding in the retention order (Case Doc. # 301) that "PWC does not hold or represent an interest adverse to the Debtor's estate and is a 'disinterested person'" was specifically based on BCPM's retention application, PwC's disclosure of compensation, the first Barr affidavit and the supplemental Barr affidavit.

What is readily apparent from the above recitation of facts are the following:

(1) Of the four 90–day transfers identified in the Complaint, only two (namely, the 03/18/02 transfer of $25,250 and the 03/19/02 transfer of $54,158) are identified in the retention application.

(2) Two transfers identified in the Complaint as 90–day transfers (namely, the 03/14/02 transfer of $285,165.70 and the 03/08/02 transfer of $63,385) are mentioned nowhere in the retention application process.

(3) Barr's first affidavit and his PwC disclosure of compensation reciting that PwC received payments totaling $214,996.10 from BCPM are consistent with what BCPM represented in the retention application but quite different from transfers alleged in the Complaint.

(4) It seems clear from the U.S. Trustee's objection to the retention application that in assessing disinterestedness he was focusing only on the four transfers identified in the retention application and in the PwC disclosure of compensation.

(5) In his supplemental affidavit, Barr obviously focused only on the four transfers identified in the retention application and in the PwC disclosure of compensation.

(6) When the U.S. Trustee withdrew his objection to the retention application, it seems clear that it was done on the basis of him being satisfied that based on the representations made by Barr in his supplemental affidavit no colorable preferential claim existed with respect to the four transfers identified in the retention application.

(7) The transfer facts presented to the Court by PwC in connection with the retention pointedly represented that there were no other relevant transfers. The Complaint contradicts that representation.

"Claim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case over which the court would have had jurisdiction." *See E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3d Cir.2000). To bar a claim under the doctrine of res judicata, the underlying facts need to be "essentially the same" as those litigated in the prior proceeding. *CoreStates Bank. N.A. v. Huls Am., Inc.*, 176 F.3d 187, 203 (3d Cir.1999) ("[W]here the factual underpinnings of the subsequent claim are not essentially the same as those of the claims raised in the confirmation proceeding, the latter should not have a claim preclusive effect on the former."). Here, the facts supporting BCPM LLC's preference count are clearly not "essentially the same" as those raised in connection with any prior proceeding, specifically the retention proceeding.

The doctrine of judicial estoppel is one the courts only invoke if necessary to prevent a "miscarriage of justice." *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir.2003) (citations omitted). "Asserting inconsistent positions does not trigger the application of judicial estoppel unless 'intentional self-contradiction is . . . used as a means of obtaining unfair advantage.'" *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir.1996) (citation omitted). The inconsistencies here are because of inconsistent underlying facts, including facts represented by PwC in the first proceeding that are inconsistent with the facts alleged in the Complaint. Furthermore, BCPM gained no unfair advantage over PwC in the retention in the chapter case because PwC was fairly compensated for that work and BCPM LLC is not seeking any disgorgement of that compensation.

To prevail on an equitable estoppel theory, the moving party must establish that "(1) a representation of fact was made to them, (2) upon which they had a right to rely, and (3) the denial of the represented fact by the party making the representation would result in injury to the relying party." *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 164 (3d Cir.2002) (citation omitted). PwC has not demonstrated any reliance on representations of BCPM because PwC made the same representations to this Court.

Given the substantial extent to which the two transfers identified in both the retention application and the Complaint were litigated in the retention process, I find that under the doctrine of res judicata those two transactions should not be subject to further challenge as preferences. However, given the narrow focus of the retention application process and the specific identification of four transfers to the exclusion of any other transfers, I conclude that the two 90–day transfers identified in the Complaint but not identified in the retention application process are subject to challenge as preferences and the challenge is not barred by res judicata or any theory of estoppel. And, of course, the alleged fraudulent transfers identified in the Complaint as occurring in the period between 90 days and one year prior to the petition date were not implicated at all in the retention process and are therefore not subject to res judicata, judicial estoppel or equitable estoppel defenses.

The facts here are similar to those addressed by Judge Fitzgerald in *PHP Liquidating LLC v. PricewaterhouseCoopers LLP (In re PHP Healthcare Corp.)*, Nos. 98–2608 & 00–665, 2002 WL 923932 (Bankr.D.Del. May 7, 2002) where the Court, in denying a summary judgment motion, held that a prior finding of disinterestedness in a retention order did not sustain a res judicata defense. In the *PHP* case, like the matter here, PwC was retained as an accountant for the debtor and subsequently, following confirmation of a plan of liquidation, the liquidating agent, as the owner of the debtor's causes of action, filed a $900,000 preference action against PwC. The opinion specifically notes in several places that the alleged preference transfers were not properly disclosed in the retention application.

Although the application to retain PwC as Debtor's accountant and financial advisor contained information about amounts paid by Debtor to PwC during the year before the Chapter 11 petition was filed, the application does not disclose that within the 90 days prior to filing PwC was paid more than $900,000.

\* \* \* \* \* \*

The court did not "infer" disinterestedness. It found disinterestedness based on information disclosed by PwC, which has proven to be incomplete. The court was not informed of the payments that PwC received which are now alleged to be preferential.

*Id.* at *1, 3 (footnote omitted). Likewise here, we have incomplete information in the retention process and this Court should not be deemed to have found disinterestedness with respect to undisclosed transfers to PwC.

### Pleading Fraudulent Transfer

 A plaintiff states a § 548(a)(1)(B)(i) claim for fraudulent transfer and conveyance by demonstrating that the debtor received less than a reasonably equivalent value in exchange for the transfer made. The determination of reasonably equivalent value is a two-step process. First the court must determine whether the debtor received value. Second, the court must examine whether the value received is reasonably equivalent to the value transferred. *Mellon Bank. N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir.1996). The court must examine all aspects of the transaction to measure carefully the value of the benefits received by the plaintiff. *Id.*

 The quality of professional services is within the scope of a fraudulent conveyance action. *Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Missouri & Western Ry. Co.)*, 124 B.R. 769, 773 (Bankr.N.D.Ill.1991). In *Chicago*, plaintiffs sought to avoid and recover as fraudulent conveyances payments made to an investment advisor in exchange for professional services. *Id.* at 772. As in this case, defendants moved to dismiss the claims, arguing that a "fraudulent conveyance action can never be based on the

quality of services rendered by a professional." *Id.* at 773. The court rejected this argument and denied the defendants' motion to dismiss, finding plaintiffs had sufficiently alleged they did not receive reasonably equivalent value for the transfers based on the quality of the investment advisors services. *Id.* The court found that "[a]t this point it cannot be said that the Trustee could prove no set of facts which would entitle it to relief, and [defendant]'s motion to dismiss the Trustee's Amended Complaint is denied as to [the fraudulent conveyance claims]." *Id.*

 Through PwC's alleged negligent conduct, BCPM LLC alleges that BCPM received less than "reasonably equivalent value" for such transfers. One indication of this is that the Complaint alleges that BCPM hired KPMG to duplicate some services previously performed by PwC. While identifying PwC's alleged missteps in order to quantify the value of its services may be difficult, that does not warrant a dismissal at this early stage of the proceedings. The Complaint also alleges that BCPM was insolvent at the time these payments were made or was made insolvent by these payments. BCPM LLC does not have to prove that allegation at this stage of the proceeding. Thus, I find the allegations sufficient to plead a fraudulent transfer claim.

For the foregoing reasons, PwC's motion to dismiss the Complaint is denied, subject to a dismissal of the two preference transfers identified above as being barred by res judicata.

### ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the motion (Doc. # 12) of defendant PricewaterhouseCoppers LLP to dismiss the plaintiff's complaint is **denied**, except that it is **granted** with respect to two preference

transfers, namely, the 03/18/02 transfer in the amount of $25,250 and the 03/19/02 transfer in the amount of $54,158.