**In re MDIP INC. (formerly Mosler Inc.), et al., Debtors.**

**The Litigation Trust of MDIP Inc. (formerly known as Mosler Inc.) and its Affiliates, as Assignee of Certain Claims Pursuant to the Second Amended Joint Plan of Liquidation of MDIP Inc. and its Affiliates, Plaintiff,**

v.

**De La Rue Cash Systems Inc., De La Rue Systems Americas Corporation, and De La Rue Inc., Defendants.**

**Bankruptcy No. 01–10055 PJW.**
**Adversary No. 03–55177(PJW).**

United States Bankruptcy Court, D. Delaware.

Oct. 26, 2005.

allow any of the costs which rely on Exhibit S–13, it is not necessary to rule on this objection.

Robert J. Stearn, Jr., Marcos A. Ramos,
Richards, Layton & Finger, P.A., Wilming-

ton, DE, Kenneth S. GoodSmith, GoodSmith, Gregg & Unruh, LLP, Chicago, IL, for Defendants De La Rue Cash Systems Inc. and De La Rue Inc.

Mark Minuti, Saul Ewing LLP, Wilmington, DE, Howard B. Levi, Richard F. Lubarsky, Levi, Lubarsky & Feingenbaum LLP, New York, NY, for Plaintiff.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

In this adversary proceeding defendants De La Rue Cash Systems Inc.'s and De La Rue Inc.'s (collectively, the "Defendants") motion (Adv.Doc. # 97) seeks summary judgment on the fraudulent transfer claim of plaintiff Litigation Trust of MDIP Inc.'s adversary complaint. For the reasons set forth below, Defendants' motion for summary judgment will be denied.

## BACKGROUND

On October 9, 1998 Mosler Inc. ("Mosler") (subsequently known as "MDIP") paid approximately $34 million to Defendants to acquire their United States security equipment business, known as "LeFebure." On August 6, 2001, Mosler and its affiliated debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). On June 26, 2003, this Court confirmed Mosler's Second Amended Joint Plan of Liquidation (the "Plan"). Pursuant to the Plan, the Litigation Trust of MDIP Inc. And Its Affiliates (the "Plaintiff") was created to pursue avoidance actions. Accordingly, Plaintiff is the assignee of the claim asserted in this proceeding.

De La Rue plc is a publicly traded U.K. corporation. (Adv.Doc. # 98, p. 6). A principal division of De La Rue plc was the Cash Systems Division. (Adv.Doc. # 115,

Exh. 28, p. 8). The Cash Systems Division included a cash handling business and a security equipment business; the United States security equipment business was known as LeFebure. (Adv.Doc. # 115, Exh. 28, pp. 9–11).

LeFebure manufactured, sold, and serviced physical security equipment and electronic security equipment. (Adv.Doc. # 98, p. 6). De La Rue plc owned LeFebure through two wholly owned subsidiaries: De La Rue Cash Systems Inc. and De La Rue Systems Americas Corporation. (Adv.Doc. # 115, Exh. 28, pp. 10–11). De La Rue Cash Systems Inc. and De La Rue Systems Americas Corporation are the entities that sold LeFebure to Mosler. (Adv. Doc. # 41, ¶¶ 4,5,11).

De La Rue Systems Americas Corporation, however, supposedly no longer exists. (Adv.Doc. # 41, ¶ 6). Plaintiff alleges that De La Rue Inc. is the successor in interest to De La Rue Americas Corporation. (Adv.Doc. # 41, ¶ 6). Consequently, De La Rue Inc. and De La Rue Cash Systems Inc. are defendants in this action.

Prior to the petition, Mosler's principal business was the manufacture, sale, installation and service of security systems and products primarily used by financial institutions. (Doc. # 910, pp. 11–12). Because LeFebure and Mosler were both in the security equipment business, they were in competition with each other. (Adv.Doc. # 115, Exh. 28, p. 193). The industry, however, was maturing.

On August 5, 2003, Plaintiff commenced this action seeking to avoid and recover from Defendants an allegedly constructively fraudulent transfer, under Section 544(b) of the Bankruptcy Code and applicable state law. The transfer at issue is Mosler's October 9, 1998 payment of roughly $34 million to Defendants for LeFebure. After the parties completed

fact discovery, Defendants moved for summary judgment, asserting that there are no genuine issues of material fact as to whether Plaintiff received reasonably equivalent value.

## DISCUSSION

### Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[1] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could lead a reasonable trier of fact to find for the non-moving party, disposition by summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At this stage of the proceeding, "[t]he Court may not weigh the evidence or assess credibility." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 214–15 (3d Cir.2005) (citation omitted).

### Choice of Law

The possible choices of state law include Ohio law, Iowa law, or even Delaware law. Both parties acknowledge that "Ohio and Iowa fraudulent transfer law are similar, both being based on the Uniform Fraudulent Transfer Act, and both substantially track Section 548 of the Bankruptcy Code." (Adv.Doc. # 98, p. 29) (citations omitted); (Adv.Doc. # 111, p. 30). "Thus, choice of law is unlikely to affect the outcome here." (Adv.Doc. # 98, p. 30). Since no party has pointed to any differences in the various laws, and since all three choices are based on the Uniform Fraudulent Transfer Act, the outcome in this case would be the same under any of the three. *See* OHIO REV. CODE ANN. §§ 1336.04(A)(2) and 1336.05(A) (2005); IOWA CODE ANN. §§ 684.4(1)(b) and 684.5(1) (2005); DEL. CODE ANN. tit. 6, §§ 1304(a)(2) and 1305(a) (2005).

### Fraudulent Transfer Test

Under applicable law, a transfer is constructively fraudulent if the plaintiff can show, by a preponderance of the evidence, that the debtor made the transfer without receiving reasonably equivalent value. In addition, the plaintiff must also prove that at the time of the transfer, the debtor either: a) was insolvent or became insolvent as a result of the transfer; b) was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or c)intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. OHIO REV. CODE ANN. §§ 1336.04(A)(2) and 1336.05(A) (2005); IOWA CODE ANN. §§ 684.4(1)(b) and 684.5(1) (2005); DEL. CODE ANN. tit. 6, §§ 1304(a)(2) and 1305(a) (2005).

---

1. Federal Rule of Civil Procedure 56(c) is applicable to matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7056.

■ At issue in this motion, however, is only whether Mosler received reasonably equivalent value. To answer this, a court must first determine if the debtor received any value. Then, the court must determine whether the value received is reasonably equivalent to the value transferred. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir. 1996). In this case, it cannot be questioned that Mosler received something of value; it received LeFebure's assets and the potential savings associated with the purchase of a competitor. The issue then is whether, and to what extent, Mosler's payment was not reasonably equivalent to the value received.

■ The applicable statutes do not define "reasonably equivalent." *Id.* at 148. Rather, courts have defined the scope and meaning of the term. *Id.* In doing so, courts consider the totality of the circumstances. *Id.* at 153.[2] This is not strictly a mathematical formula. Courts have generally considered three factors: (1) whether the transaction was at arm's-length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid. *Id.* at 145. Certainly, the fact that a transaction occurred at arm's-length is one considerable factor in the determination. But a court "must examine all aspects of the transaction to measure carefully the value of the benefits received by the plaintiff." *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt.)*, 320 B.R. 265, 280 (Bankr.D.Del.2005) (*citing Mellon Bank*, 92 F.3d at 154).

■ Ultimately, reasonable equivalence has a large factual component. *See Mel-*

lon Bank, 92 F.3d at 147 (" 'less than fair consideration' ... [is a] mixed question[ ] of law and fact." (citation omitted)); *see also* 5 COLLIER ON BANKRUPTCY P 548.05 (15th ed. rev.2005) ("Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts."). This is especially true in this case where the debtor purchased a competitor in a similar line of business. *Mellon Bank*, 92 F.3d at 155. ("We also acknowledge that whether a contemplated investment provided a significant 'chance' to receive value more often than not will be bound up in the bankruptcy court's factual determinations and, thus, largely immune from attack on appeal.").

■ Although in some circumstances summary judgment may be appropriate to dispose of a fraudulent conveyance claim, *see, e.g., Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 545–47 (D.Del.2005), the case before me does not warrant such treatment.

*Defendants' Assessment of a Sale Price*

In early 1997, De La Rue plc considered the viability of its cash handling and security equipment businesses in the United States. (Adv.Doc. # 115, Exh. 27. pp. 28–29). As a result, in the latter half of 1997, De La Rue's senior management began drafting a report with the internal code-name "Project Salmon." (Adv.Doc. # 113, Exh. 4). Project Salmon analyzed and made certain recommendations regarding the cash handling and security equipment businesses in the United States. In August of 1997, Joseph Patten, President and Chief Executive Officer of De La Rue Systems Americas Corporation, gave a man-

---

**2.** To be clear, the totality-of-the-circumstances test applies to the second prong of the

inquiry-not the initial question of whether the debtor received any value.

agement presentation estimating the value of LeFebure at $13 million and indicated that the strategic value of LeFebure was $20 million. (Adv. Doc. # 114, Exh. 11, LFB 11645). Shortly after, however, Mr. Patten apparently disavowed the $20 million valuation.

On September 8, 1997, a draft of Project Salmon was issued estimating LeFebure's "value" at $12–16 million. (Adv.Doc. # 113, Exh. 6). Three days later, Mr. Patten expressed concern that even the $12–16 million figure may be too aggressive. (Adv.Doc. # 114, Exh. 12). Nonetheless, in early October, a finalized draft of Project Salmon was issued with a LeFebure valuation of $12–16 million. (Adv. Doc. # 113, Exh. 4). On October 22, 1997, the board of directors of De La Rue plc approved the Project Salmon report; in doing so, the board approved the sale of LeFebure for a price of $12–16 million.

After board approval, De La Rue employed Schroders-an investment banking firm. On January 26, 1998, Schroders issued a report valuing the business at $15–25 million. (Adv.Doc. # 114, Exh. 18). Just 11 days later, on February 6, 1998, Schroders increased its valuation by $10 million (from a range of $15–25 million to $25–35 million). (Adv.Doc. # 114, Exh. 19).

Then, in April of 1998, De La Rue plc received a $27 million offer from Mosler. (Adv.Doc. # 115, Exh. 31, p. 61). Subsequently, Mosler increased its offer. On September 30, 1998, the De La Rue entities and Mosler entered into an Asset Purchase agreement for most of LeFebure's assets. (Adv.Doc. # 113, Exh. 1). On October 9, 1998, Mosler transferred to De La Rue approximately $34 million. (Adv.Doc. # 41, ¶ 12).

The disagreement between the parties primarily arises from their differing interpretations of the De La Rue internal report Project Salmon. That report concluded, among other things, that LeFebure was a non-core business and was losing money. The report proposed that De La Rue ought to separate the cash handling business from LeFebure and "dispose" of LeFebure's assets for $12–16 million. Plaintiff alleges that this transfer was constructively fraudulent: $16 million not being reasonably equivalent to $34 million.

Defendants assert that, regardless of what the Project Salmon report stated, the payment of $34 million was reasonable in light of the fact that the transaction was at arm's-length and between sophisticated parties. Defendants offer the affidavit of Thomas Wall, who was a member of Mosler's board and a Managing Director of Mosler's majority stockholder. Mr. Wall's affidavit says that the negotiations with De La Rue were conducted at arm's-length and that Mosler anticipated benefiting from synergies from the transaction that would explain the purchase price of $34 million. However, Mr. Wall's statement must be viewed in light of the fact that he and his co-directors face accusations by Plaintiff in a separate lawsuit that they "breached their fiduciary duties in approving the purchase of LeFebure, including because they ignored their duties to obtain a valuation of LeFebure and to ensure that Mosler conducted adequate due diligence, which resulted in Mosler vastly overpaying for LeFebure." (Adv. Doc. # 111, p. 28 n. 17).

In addition, Defendants argue that the Project Salmon report did not mean what it said when it valued LeFebure at $12–16 million. Plaintiff, however, argues that the Project Salmon report, and other internal documents, represented a valuation of LeFebure that cannot be ignored by the Court.

At this stage of the case, a court may not weigh the evidence. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). As such, Plaintiff puts forth evidence that this Court cannot simply disregard. Plaintiff cites to Project Salmon and other De La Rue internal documents valuing LeFebure at $12–16 million. (Adv. Doc. # 113, Exh. 4). Plaintiff's expert also confirmed the value of LeFebure at $15–16 million. (Adv.Doc. # 112, ¶ 6). These figures suggest a purchase price of over double the business's value. Viewing such evidence in a light most favorable to Plaintiff, a reasonable finder of fact could conclude that Mosler did not receive reasonably equivalent value.

Internal documents of Defendants repeatedly reference a range of $12–16 million. The Project Salmon report itself states that figure numerous times, in numerous contexts. (Adv.Doc. # 113, Exh. 4). In the Executive Summary, for example, the report requests authorization to dispose of the business "for a consideration in the range of US$ 12–16m." (Adv. Doc. # 113, Exh. 4, p. 1 and App. D1). In the section marked Proposal, the report again reiterates that it "is envisaged that disposal proceeds ... would be approximately $12.0 million to $16.0 million ...." (Adv. Doc. # 113, Exh. 4, p. 2 and App. D2). Under the caption Technical Risks, the report hypothesizes a situation where the transaction was delayed for a year and "the *valuation* fell from $12m to 10m ...." (Adv. Doc. # 113, Exh. 4, p. 9 and App. D4) (emphasis added). In the Financial Analysis section, the report states "[i]t is assumed that the business can be sold for a price in the range of US$ 12–16m." (Adv.Doc. # 113, Exh. 4, p. 20).

From the above, Plaintiff argues that the Project Salmon report valued LeFebure at a price between $12–16 million. In fact, it is undisputed that the plain language of the report asks the board to grant approval for a sale between $12–16 million, the estimated disposal price; it is equally undisputed that the board approved the sale of LeFebure for $12–16 million. Moreover, the report specifically refers (in more than one place) to the range of $12–16 million as a "valuation" and hypothesized a decrease in this valuation of the business over time. (Adv. Doc. # 113, Exh. 4, p. 9 and App. D4).

Defendants argue, however, that the $12–16 million range was based on net asset value (also referred to as capital employed) rather than the value of the business as a going-concern. According to Defendants, the range did not account for the strategic value of the business. Also, Defendants assert the range was not really a valuation despite being termed as one; rather, the range supposedly represented only the minimum sale price necessary so as to not report a loss on the transaction. As a final effort, Defendants suggest that the report was issued too far in time from the sale and, as a result, the value of LeFebure increased.

Defendants' contentions are not without some merit. But this is not nearly enough to prevail on a motion for summary judgment. Contrary to Defendants' assertion, there is ample evidence that could lead a reasonable trier of fact to conclude that the $12–16 million contemplated the strategic value. The Project Salmon report itself stated as follows:

> It is proposed that the loss-making LeFebure Security Equipment business ... is disposed of through an auction to interested parties. This would potentially include other security companies and utility companies in the United States. It is envisaged that disposal proceeds for this loss making business

would be approximately $12.0 million to $16.0 million . . . .

(Adv.Doc. # 113, Exh. 4, p. 2).

*Conflicting Deposition Testimony*

The deposition of Hadyn Abbott, the Managing Director of the Cash Systems Division, supports the valuation of the business at some figure not reasonably equivalent to $34 million. It explains the above quoted provision of Project Salmon and cuts against Defendants' argument that the range represented only the net-asset value. In pertinent part, the deposition provided as follows:

Q. The sentence [in Project Salmon] goes on to say, "It is envisaged that disposal proceeds would be around £ 7.5 to £ 10 million ($12 to 16 million) and that disposal costs would be approximately 0.5 million (0.8 million)."

A. Yes

. . .

Q. Was the figure of $16 million equal to the capital employed of the security equipment business of De La Rue plc in the United States?

A. I think at that time the calculation of capital employed was in the range of 10 to 12 million.

(Adv. Doc. # 115, Exh. 28, p. 49 lines 2–20). Obviously, if the capital employed was $10 to $12 million—it was not $16 million. Where then did the $16 million derive from? Defendants have no answer for what the $16 million represents, other than to say that it does not represent a valuation. Plaintiff suggests, as the Project Salmon report states, that this figure is De La Rue's valuation of the business and that it takes into account more than the business's net asset value. In other words, Plaintiff suggests that the $16 million figure contemplates the value to a

strategic buyer. Mr. Abbott's deposition states as follows:

Q. It [Project Salmon] says, "It is proposed that the loss-making LeFebure security equipment business (product and service, including Electronic Security) is separated from the cash handling business, and then disposed of through an auction to interested parties. Such parties may include other security companies and utility companies in the Unites States"; do you see that?

A. Yes.

. . .

Q. My question is, the reference to "security companies", is that a reference to companies, among others, in the United States that were in the same or similar business to De La Rue's security equipment business?

A. Yes but not necessarily only those in the United States.

. . .

Q. And you considered Mosler Inc. . . . to be in the security business?

A. Yes

(Adv. Doc. # 115, Exh. 28, p. 46 lines 7–15, pp. 48–49 lines 6–1). Thus, according to Mr. Abbott, at the time Project Salmon predicted a value of $12 to $16 million, it had in mind Mosler, and other firms in similar lines of business. Such firms would be strategic buyers:

THE WITNESS: A strategic buyer is one who, through the purchase of the company that one is selling, gains benefits through synergy, through the merging together the consolidation of manufacturing, gains benefits which an independent third party not involved in this business or not involved in the United States would not gain.

. . .

Q.... Is your understanding that the potential interested parties at an auction was envisioned to, would include strategic buyers?

...

THE WITNESS: ... definitely.

(Adv. Doc. # 115, Exh. 28, p. 52 lines 11–18, p. 53 lines 13–17). From the depositions and the internal documents (most importantly Project Salmon itself), it is reasonable to conclude that 1) the $16 million figure represented more than the net assets of the business because $12 million represented the net asset value 2) that the report contemplated the value of the business to strategic buyers and 3) that $16 million was the high end of the company's internal valuation.

Not all of Mr. Abbott's statements favor Plaintiff's interpretation, however. When asked whether the $12 million to $16 million number attempted to include synergies, Mr. Abbott responded "No, it did not." (Adv. Doc. # 115, Exh. 28, p. 193 line 3). Even so, Mr. Abbott failed to explain what the $16 million figure represented. Later, Mr. Abbott indicated that he believed De La Rue could obtain more than the $12–16 million from the sale of LeFebure. He believed they could obtain $20 million. (Adv. Doc. # 115, Exh. 28, pp. 155–56 lines 18–7). Twenty-million dollars, however, is still not reasonably equivalent to the $34 million purchase price.

A $20 million figure was listed in internal documents for the strategic value of the business in September 1997:

**Valuation of SE**
*Business for Disposal*

| | |
|---|---|
| — Net assets | 13 million |
| — Earning | Not applicable |
| — Strategic value | 20 million |

(Adv. Doc. # 114, Exh. 11, LFB 11646) (italics and bold in original). According to Plaintiff, the $20 million figure was disavowed as too aggressive. There is ample support for this in the record, especially since the final draft of Project Salmon stated a "valuation" of $12–16 million. Mr. Patten expressed concern over the $12–16 million figure: "There is a significant risk (greater than 6C 50) that the security equipment economics presented in EA—1804 [the Project Salmon Report] are too optimistic." (Adv. Doc. 114, Exh. 12, LFB 12531).[3]

As a result, one reasonable conclusion is that the business, including its strategic value, was worth $20 million. Another reasonable conclusion is that the plain language of the Project Salmon report means what it says: the business had a value of $12–16 million. Either of these interpretations defeats Defendants' motion for summary judgment. Both interpretations are reasonable; and, both interpretations are reflected in the internal documents, which existed at the time of the transfer.[4]

---

3. Jeremy Marshall, CEO of De La Rue plc, also seemingly expressed concern over whether the $12–16 million was too aggressive. Mr. Marshall apparently drafted a memorandum that stated "I look forward to finding that the Schroders valuation of the business is not markedly different from the 12 to 16 million which has already been quoted by Joe Patten." Mr. Marshall also seems to have had an opportunity to speak to the $20 million valuation; unfortunately, however, only excerpts of the depositions were submitted with the motion papers. (Doc # 115, Exh. 30, pp. 11–12, 25).

4. An initial valuation of Defendants' investment banking firm placed the value of the business between $15 million and $25 million. Even assuming the top of this range, the sale price was a full $9 million greater than the valuation. Although this range was later increased by $10 million, the initial valuation is instructive; it adds a third valuation that may be viewed as not reasonably equivalent to the ultimate purchase price. (Adv. Doc. # 103, Exh. 28, LFB 13349).

*Time Lapse Effect on Value*

The parties also dispute whether the passage of time between the Project Salmon report's issuance and the transfer date decreased or increased LeFebure's value. Undisputed, however, is that LeFebure was a "loss-making" business. (Adv.Doc. # 125, p. 9). It is similarly undisputed that the Project Salmon report hypothesized a situation where the sale took over a year to be completed, and where the "valuation fell from $12m to $10m." (Adv.Doc. # 113, Exh. 4, p. 9). Specifically, Project Salmon contemplated the potential risk of "the unlikely loss of a major customer." (Adv.Doc. # 113, Exh. 4, p. 9).

Both parties acknowledge that this unlikely event did in fact occur: LeFebure's largest customer (Nationbank) was lost before consummation of the sale. Nevertheless, the parties diverge on whether the exclusion of such a major customer added or decreased the business's value. Plaintiff contends that the Project Salmon report was correct, the exclusion of a substantial customer of LeFebure decreased its value. In contrast, Defendants assert (contrary to the Project Salmon report's analysis) that Nationbank was an unprofitable customer and the loss, actually, added value. (Adv.Doc. # 125, pp. 10–11). This issue must be resolved at a later stage of this adversary proceeding.

*Plaintiff's Expert's Valuation*

Further, to grant Defendants' motion would require this Court to completely ignore Plaintiff's expert's valuation. Defendants suggest as much and cite to *Peltz*

*v. Hatten*, 279 B.R. 710 (D.Del.2002), for such a proposition.

Under these circumstances, *Peltz v. Hatten* is instructive but distinguishable. In that case, the District Court found against the plaintiff on his claim of fraudulent transfer because, among other things, the plaintiff failed to show that the price paid was not reasonably equivalent to the value of the assets received. *Id.* at 742. In coming to this conclusion, the District Court judge—in a bench trial and thus sitting as the finder of fact—carefully considered the evidence; and, after weighing the evidence, determined that the plaintiff could not satisfy his burden of proof. *Id.* The judge specifically considered the testimony of numerous expert witnesses and found that the plaintiff's evidence was not convincing. *See id.* at 728–34. Although after the bench trial the judge resolved that the plaintiff could not meet his burden, he did so only after hearing, and finding flaws with, the plaintiff's experts' valuations.

Like *Peltz*, this Court is mindful that this transaction occurred at arm's-length and that an expert's testimony may be colored by hindsight. Unlike *Peltz*, however, this Court has not yet had an opportunity to weigh the facts; and, at this stage, such a balancing would be inappropriate.[5]

In this case, the parties' expert reports sharply diverge. Plaintiff's expert places a value of LeFebure, as of the relevant date, at $15–16 million. (Adv.Doc. # 112, ¶ 6). This number is in line with Project Salm-

---

**5.** The Third Circuit affirmed the District Court in *Peltz* and refused to disturb the trial court's factual findings. In affirming, the Third Circuit noted: "[i]t was well within the District Court's prerogative as finder of fact to choose not to rely on the speculative testimony of appellant's experts as colored by hindsight and the interests of litigation, especially

when the ... price paid ... was the product of arm's-length negotiations ...." *Peltz v. Hatten (In re USN Communs.),* 60 Fed.Appx. 401, 402 (3d Cir.2003). On a motion for summary judgement, however, it would be inappropriate for this Court to choose to ignore Plaintiff's expert's valuation.

on. In contrast, Defendant's expert places the value of LeFebure, as of the relevant date, on a stand-alone basis of $59.1 million but estimates the value of LeFebure to Mosler, as of that date, at $122.5 million. (Adv.Doc. # 112, ¶ 10).

At this point, the experts' have not yet had an opportunity to testify or be deposed. Before disposing of the expert reports, some weighing of their evidentiary value is required. As mentioned, such a weighing is inappropriate at this juncture.

In sum, it is worth emphasizing that Plaintiff does not solely rely on its expert's valuation but also presents numerous documents, which existed at the time of the transaction and were developed by Defendants, valuing LeFebure at significantly less than the purchase price. These documents, most notably Project Salmon, cannot be dismissed. Defendants, however, argue that this Court should ignore this evidence, that the evidence does not mean what it plainly says, and that Plaintiff must lose because the transaction was at arm's-length and between sophisticated parties. Although the arm's-length nature of the transaction is persuasive, this Court must take into account the totality of the circumstances. *Mellon Bank*, 92 F.3d at 153. Even putting aside these expert reports, as discussed above, the numerous documents and conflicting deposition testimony present genuine issues of material fact.

## CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion for summary judgment.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, Defendants' motion (Adv.Doc. # 97) for summary judgment is **denied**.